JOHN H. TEMPLE ET AL., COMPLAINANTS–APPELLANTS,
v. CLINTON TRUST COMPANY ET AL., DEFEND-
ANTS–RESPONDENTS.

Argued November 29, 1948—Decided December 20, 1948.

*Mr. Isadore Glauberman* argued the cause for complainants-appellants (*Mr. Samuel Hollander,* attorney).

*Mr. Herbert J. Hannoch* and *Mr. Fred Herrigel, Jr.* argued the cause for defendants-respondents William Beckelman and Markley Opdyke, Class Representatives of Common Stockholders, and Pascal & Beckelman, Inc.

*Mr. Charles Danzig* argued the cause for defendant-respondent Fidelity Union Trust Company (*Messrs. Riker, Emery & Danzig,* attorneys).

*Mr. Richard J. Congleton* argued the cause for defendants-respondents, Clinton Trust Company and Thomas L. H. Crooks, et al., trustees in dissolution of Clinton Trust Company.

The opinion of the court was delivered by

HEHER, J. The essential question here is whether assets transferred by the Clinton Trust Company to the Newark Mortgage Company, a subsidiary holding company, "were impressed with a trust" for the benefit of the holders of participation certificates issued by the Mortgage Company to depositors of the Trust Company as of March 3, 1933, when it suspended business in accordance with the Presidential proclamation of a "bank holiday," enforceable against the surplus remaining upon the dissolution and liquidation of the Trust Company now in process, to the extent of the value of such of the assets as were retransferred to the Trust Company. The Trust Company was insolvent at the time business was suspended.

The transfer to the Mortgage Company was made pursuant to a plan of reorganization of the Trust Company formulated by a depositors' committee under ch. 116 of the *Pamphlet Laws* of *1933,* and approved by depositors and creditors of the institution having in sum the minimum statutory interest and the Commissioner of Banking and Insurance, effective December 26, 1933. *Vide Bascn v. Clinton Trust Co.,* 115 *N. J. L.* 546 *(E. & A.* 1935*).* The retransfer of assets was made under a provision of the plan of reorganization reserving to the Trust

Company "the right to substitute any of the assets which remains in its possession after the transfer of assets to the holding company."

Under the reorganization, 50% of the deposits was made available in cash; and the remaining 50% was "waived" "in exchange" for Class B preferred stock of the Trust Company, "equal to approximately one-half of the amount waived," and participation certificates issued by the Mortgage Company for the remainder. The necessary capital fund of $400,000 was set up through the advancement of $250,000 by the Reconstruction Finance Corporation on the security of Class A preferred stock and the sale to stockholders of the bank "and others" of Class B preferred stock for $150,000. Thereby, a surplus of $574,012 was created.

The certificates evidenced the holder's right to "participation" in assets "aggregating $948,896.19" transferred by the Trust Company to the Mortgage Company, "subject to the right of substitution, as set forth" in the plan of reorganization, and his consent to be bound by "all terms and provisions" of an agreement between the Trust Company and the Mortgage Company made on April 20, 1934, which agreement obligated the Trust Company to transfer to the Mortgage Company "such part of its assets as have been deemed unacceptable by the Reconstruction Finance Corporation," whose total book value was in the sum last mentioned, with the reservation of the right of substitution by the Trust Company, for a period of five years thereafter, or any of the assets retained by it under the plan of reorganization "for any of the assets transferred" to the Mortgage Company, or any assets in the latter's hands "as a result of any such substitution." It was further provided that "All of the assets exchanged on such substitution or substitutions shall be held by each of the parties hereto, subject to all of the terms of this agreement, and each of the parties hereto shall have the same rights with respect to the assets so exchanged as though such assets had been originally retained" by the Trust Company "or originally transferred" by it to the Mortgage Company "under the terms of this agreement." The latter was obligated to liquidate all its assets "at the expiration of 10 years." In

due course it accounted for its administration in the Court of Chancery; and by a decree entered on April 3, 1945, its account, "including the substitution of assets," was allowed. Upon payment of the dividend of approximately 5%, complainants surrendered their participation certificates.

The allegation of the bill is that between May, 1934 and April, 1939, transfers of assets having a value of $340,000 and upwards were made by the Mortgage Company to the Trust Company in substitution for "worthless assets." The gravamen of the bill is that because of the Trust Company's insolvency at the time, "its assets were charged with an equitable lien for the benefit of its creditors and depositors." On the oral argument counsel contended that the lien attached at the time of substitution. It is said that the right of substitution reserved by the Trust Company "was for the benefit" of its "depositors who became the holders of participation certificates," and there was no "intention" that the right "should be used to deplete the assets of the Holding Company for the purpose of increasing the equity of the common stockholders (of the Trust Company) at the expense of the depositors and creditors * * * who became holders of participation certificates," and so the Trust Company and the Mortgage Company "were in the position of trustees" for their benefit. But this evinces a misconception of the design of the provision for substitution.

## I.

The merits are open to examination. The plea of *res judicata* is not well founded. The decree allowing the account of the Mortgage Company "and proceedings in respect to said assets, including the substitution of assets," is not conclusive of the issue of the certificate holders' right to the surplus remaining after liquidation of the Trust Company as against the latter's common stockholders. An adjudication establishing the propriety of the substitutions, as wholly in keeping with the contractual rights of the parties, is not decisive of complainants' asserted equity in the Trust Company's surplus, grounded also in the contract. Complainants do not challenge the right of substitution under the contract, nor the propriety of the ex-

ercise of the right. It is the disposition of the surplus that is in issue here. The case of *Shearman v. Cameron,* 78 *N. J. Eq.* 532 *(E. & A.* 1911*)* is not in point.

Also, the motion to dismiss "that portion" of the appeal and "to expunge that portion of the (appellants') brief which deals with (their) rights as creditors and former depositors" of the Trust Company, as *res judicata* under the decree in *Temple v. Clinton Trust Co.,* 141 *N. J. Eq.* 372, is denied. Complainants have not brought this suit as creditors and former depositors of the Trust Company, but as certificate holders of the Mortgage Company, asserting as such a lien on the surplus after liquidation of the Trust Company. One of the reasons for dismissing the prior bill was that the Mortgage Company or its trustees in dissolution were necessary parties.

## II.

As the learned Vice Chancellor said, the reorganization was primarily designed to restore solvency and thus to enable the Trust Company to continue business as a solvent and liquid institution unhampered by the restrictions imposed by insolvency under the law. This served also the interest of the depositors, for it made one-half of the deposits available immediately, and continued solvency would secure the payment of an additional 25% of the deposits represented by the Class B preferred stock. To this end, the Trust Company was given what was deemed to be the better-grade assets at the outset and the absolute and unlimited right of substitution to insure the like preference for a period of five years. The scheme had obvious mutual advantages. But the consideration first and foremost was the continued solvency of the bank. There was no intention to create a lien upon its assets for the payment of the participation certificates; there was no stipulation whose enforcement would require the fastening of an equitable lien thereon. Indeed, it is plain that the parties did not foresee the liquidation of the Trust Company; there was no provision for that contingency. It is beyond the province of equity to substitute terms for those made by the parties to a contract, or to supply terms that have not been agreed upon. *Goerke Kirch Co. v. Goerke Kirch Hold-*

*ing Co.*, 118 *N. J. Eq.* 1, *(E. & A.* 1934*).* Obviously, a lien upon the assets of the bank while a going concern would be utterly at variance with the scheme of reorganization and would tend to defeat its operation. It would not be in keeping with the common intention.

In these circumstances, the holders of the Mortgage Company's certificates are not possessed of an equitable interest inferior to an estate enforceable against the surplus remaining after liquidation of the Trust Company. The certificate holders do not have a lien in equity upon the fund. An equitable lien is neither a *jus ad rem* nor a *jus in re.* It is simply "a right of a special nature *over* the thing, which constitutes a charge or encumbrance upon the thing, so that the very thing itself may be proceeded against in an equitable action, and either sold or sequestered under a judicial decree, and its proceeds in the one case, or its rents and profits in the other, applied upon the demand of the party in whose favor the lien exists." *Pomeroy's Equity Jurisprudence (5th ed.) sec.* 165. The doctrine of equitable liens furnishes ground for the specific remedies which equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law. These liens may be created by express executory contracts relating to specific property then existing, or property to be afterward acquired; and sometimes they are raised *ex aequo et bono,* according to the dictates of equity and conscience, as where a contract of reimbursement could be implied at law and enforced by the action of *assumpsit,* or in certain cases where contribution or reimbursement is enforceable in equity, including those involving fraud and innocent mistake. *Ibid. sections* 166, 167, 1235, *et seq.,* 1238, *et seq.* The instant case is within neither the class of "implied contracts" enumerated by Professor Pomeroy in *section* 1238, *et seq.* nor the species of equitable liens upon specific property not growing out of contract directly between the parties. *Ibid. section* 1244, *et seq.*

Here, there is no consideration of right and justice which gives rise to a lien upon the assets of the Trust Company before dissolution, or in its surplus after liquidation, in favor of the holders of participation certificates issued by the Mortgage Com-

pany. The title and interest of the Trust Company in the recaptured assets under the power of substitution was absolute and unconditional; and the diversion of the surplus now to the certificate holders would be in defiance of the contract between the parties entered into to serve their mutual interests as they were known and appraised at the time of the making of the contract. Plainly, there was no such lien or interest in the assets before the Trust Company's dissolution; by the same token, there was none thereafter, and the payment to the certificate holders of the surplus after liquidation would constitute a radical alteration of the contract. As we have seen, the contract vested in the parties "the same rights" with respect to the assets exchanged as though they had been "originally retained" by the Trust Company "or originally transferred" by it to the Mortgage Company under the agreement. There is no suggestion of fraud or bad faith. The surplus now remaining after the retirement of Class A and Class B preferred stock is substantially less than that provided by the consummation of the reorganization plan. The principle of participation by stockholders who have contributed to the reorganization of an insolvent corporation has been given recognition. *Case v. Los Angeles Lumber Products Co.*, 308 *U. S.* 106, 60 *S. Ct.* 1, 84 *L. Ed.* 110 (1939). The principle is implicit in the plan approved here.

The rights of the parties are the same in equity as at law. Courts of equity may not "depart from all precedent and assume an unregulated power of administering abstract justice at the expense of well-settled principles." *Heine v. The Board of Levee Commissioners*, 19 *Wall.* 655, 22 *L. Ed.* 223 (1873). Equity has no jurisdiction over that "large class of obligations called imperfect obligations, resting upon conscience and moral duty only, unconnected with legal obligations. * * * Generally its jurisdiction depends upon legal obligations, and its decrees can only enforce remedies to the extent and in the mode by law established." *Rees v. Watertown*, 19 *Wall.* 107, 22 *L. Ed.* 72 (1873). It was pointed out in the latter case that the "great advantage" possessed by the Court of Chancery "is not so much in its enlarged jurisdiction as in the extent and adapta-

bility of its remedial powers," and that "Generally its jurisdiction is as well defined and limited as is that of a court of law." See, also, *Goerke Kirch Co. v. Goerke Kirch Holding Co., supra.* Judge Story points out cases of fraud, of accident, and of trust which neither courts of law nor of equity presume to relieve or to mitigate. 1 *Story's Eq. Jur. sec.* 61.

The decree dismissing the bill of complaint is affirmed.

*For affirmance:* Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD, and ACKERSON—5.

*For reversal:* None.