**Morton BATT, Trustee of the Estate of Leahy Realty, Inc., Appellant,**

v.

**Robert J. SCULLY, Jr., Henry R. O'Connor, Daniel R. Bowersock, Mary M. Helverson, and John A. Binder, Appellees.**

**Civ. A. No. 93–1455.**

United States District Court, D. New Jersey.

May 16, 1994.

---

Markowitz & Zindler by Richard J. Kwansy, Lawrenceville, NJ, for appellant.

Sacharow, Adler, Gold, Taylor & Keyser, P.C. by Robert W. Keyser, Cherry Hill, NJ, for appellees.

### OPINION

BROTMAN, Senior District Judge:

The novel issue before the court in this bankruptcy appeal is whether under New Jersey law real estate salespersons are entitled to an equitable lien against their broker on sale proceeds received by the broker after the broker has entered bankruptcy proceedings. For the reasons set forth below, the court holds that the agents do not have an equitable lien.

## I. BACKGROUND

### A. Facts

The facts with respect to the relationship between the parties are not in dispute. William J. Leahy ("Leahy") was the former president, shareholder, and broker of record of Leahy Realty, Inc. ("Debtor"). On December 2, 1991, the Debtor filed a voluntary Chapter 7 Bankruptcy Petition ("Petition"). The Bankruptcy Court permitted the Trust-

1. Persons engaged in the business of real estate in New Jersey are either "brokers" or "sales-

ee, Morton Batt, to continue operating the business to utilize Leahy's broker's license for the purpose of collecting commissions.

Appellees are real estate salespersons.[1] Prior to the filing of the Petition, Appellees entered into Broker/Agent Agreements ("Agreements") with the Debtor and Leahy. The Agreements stated that the Appellees were independent contractors and not employees of the Debtor. The Agreements further provided for the means of compensation:

> Agent's only compensation shall be a portion of the brokerage received from the party for whom services are performed. The division in payment of the brokerage shall take place within ten (10) working days after the brokerage is received.

The Agreements did not provide the Appellees with a lien on the commissions obtained by the broker from the closing.

The broker/salesperson relationship is regulated in New Jersey. Two statutes are relevant to the issues before the Court.

First, N.J.S.A. 45:15–3 delineates the respective functions of brokers and salespersons. It then provides:

> No person, firm, partnership, association or corporation shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he was a duly licensed real estate broker at the time the alleged cause of action arose.

Second, N.J.S.A. 45:15–16 regulates a salesperson's commissions. It provides:

> "[n]o real estate salesman shall accept a commission or valuable consideration for the performance of any of the acts herein specified, from any person except his employer, who must be a licensed real estate broker."

The parties' dispute centers on the commissions received from the sale of ten parcels of real estate. The sale of the properties was governed by listing agreements between the sellers and the Debtor. The listing

men." N.J.S.A. 45:15–3.

agreements were entered into prior to the filing of the Petition. Appellees were not parties to the listing agreements, although in several instances it appears that the listings were obtained through their efforts. Appellees assert that they are entitled to commissions in their capacities as both listing and selling agents.

The listings produced ten contracts of sale prior to the filing of the Petition. However, all of the contracts closed after the filing.[2] In addition, all of the contracts identified the Debtor, and no other person,[3] as recipient of the commissions. Although the filing of the Petition initially produced some confusion as to whether the deals should go through,[4] the sellers eventually paid $161,000 in commissions. It is these funds, currently held in trust by Batt as Trustee, on which the Appellees seek to impose an equitable lien.

### B. Procedure

Appellees filed suit in Bankruptcy Court on March 18, 1992. After filing a joint stipulation of facts, the parties cross-moved for summary judgment. Appellees asserted, *inter alia*, that New Jersey law granted them an equitable lien on the commissions. In an

Order filed March 9, 1993, the Bankruptcy Judge agreed with Appellees and held that their claims for commissions were secured by an equitable lien.[5]

The Bankruptcy Judge framed the issue as "whether the services rendered pre-Petition are such as to create an equitable lien and whether that equitable lien attaches to the fund which was realized post-Petition from the closing of the transaction." Transcript of January 7, 1993 ("Tr.") at 40. In holding that Appellees were entitled to an equitable lien, the judge looked to equitable principles and the statutes regulating brokers and salespersons.[6]

Batt appealed to this Court. The parties ask us to resolve two issues: (1) whether the Bankruptcy Judge erred as a matter of law in awarding Appellees an equitable lien, and (2) whether the Bankruptcy Judge erred in holding that Appellees were third-party beneficiaries under the real estate contracts.[7]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

This court has jurisdiction to hear appeals from the final orders of the Bankruptcy

---

2. Actually, only nine of the contracts closed after the filing because one deal failed to go through. In addition to the nine deals which closed, another deal closed pre-filing but resulted in arbitration. The Debtor succeeded in the arbitration, receiving a commission after the filing.

3. Appellant's Brief is somewhat confusing on this point. It first states that only the Debtor was entitled to the commissions but later names Leahy as the recipient of the funds. In either event, the contracts neither named the Appellees as recipients of the commissions nor provided them with a lien on the commissions.

4. Appellees claim that the Debtor's entry into bankruptcy proceedings created a "chaotic situation" for the sellers, agents, and other brokers even though contracts for sale already existed. Appellees do not indicate the extent of the confusion or the delay, if any, in proceeding to closing.

5. The bankruptcy judge did not issue an opinion in this case. However, the judge's rationale may be discerned from the record of the hearing held on the cross-motions for summary judgment.

6. Throughout the hearing, the judge repeatedly focused her attention on the notion that one who creates a fund is entitled to it. Tr. at 25, 32, and 41. The bankruptcy judge also secured on several occasions the stipulation of counsel that the agents were the procuring cause of the sales contracts and that they expected to be paid from closing. Tr. at 11–12, 21. Thus, it is clear that she based her holding, in part, on this equitable principle.

The Bankruptcy Judge also rejected the contention that the laws regulating brokers and salesperson prohibited a claim by the Appellees against anyone except the broker for commissions. The Bankruptcy Court found that the legislature did not provide real estate salespersons with a lien because under the "statutory scheme" the rights of salespersons are derivative of the rights of brokers. Tr. at 32–33, 41–42. According to the court, the fact that the statutes made the broker the party of record did not answer the question of who created the fund.

7. Appellees dispute the issue the court is to consider. They do not argue that they are third-party beneficiaries of the real estate contracts. Rather, they argue that "to the extent that it is an issue on appeal, [the issue is] whether the Appellees are third party beneficiaries of the listing agreement between the broker and seller." Appellees also claim that the issue is whether they are beneficiaries of the lien in favor of the broker. This court will consider these related issues in its discussion *infra*.

Judge under 28 U.S.C. § 158(a).[8] The Bankruptcy Judge's Order granting summary judgment in favor of Appellees and denying Batt's cross-motion for summary judgment is a final order and thus appealable. *Stroehmann Bakeries v. Local 776,* 969 F.2d 1436, 1440 (3d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992).

With respect to the Bankruptcy Court's findings of fact, a District Court applies a clearly erroneous standard of review. B. Rule 8013; *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3d Cir.1988). With respect to the Bankruptcy Judge's conclusions of law, a District Court's review is plenary. *Id.; Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 38–39 (3d Cir.1989). Both parties accept this standard of review.

## B. Avoidance Powers of the Trustee and Applicable State Law

■ The issue in this case is one of state law but derives from federal bankruptcy law. The Bankruptcy Code gives Trustees certain enumerated powers, the most formidable of which is the "strong arm" provision captured in 11 U.S.C. § 544. Section 544 gives the Trustee the power to prevent any transfer of a debtor's property that would be voidable by one who obtains a judicial lien against the debtor on the date the bankruptcy petition is filed. 11 U.S.C. § 544(a)(1) (West.Supp. 1993). Essentially, the provision gives the Trustee the power to defeat any unperfected security interests as of the date of the filing. *Benjamin Weintraub and Alan N. Resnick, Bankruptcy Law Manual* § 7.01 at 7–7 (3d ed. 1992). A creditor whose security interest is defeated is reduced to the status of an unsecured creditor. *Id.* However, the determination of whether there is a valid pre-Petition security interest, or lien, is almost universally considered the province of state law. *Lewis v. Diethorn,* 893 F.2d 648, 650 (3d Cir.1990) (existence and powers of liens is controlled by state law absent superseding federal policy); *Weintraub and Resnick, su-*

*pra,* at § 7.01 at 7–1 (stating one must consult state law to see if trustee can avoid lien).

■ Whether a real estate agent is entitled to an equitable lien on commissions received by the broker is a question of first impression in New Jersey. The interpretation of a novel question of state law imposes certain guidelines on federal courts. Following *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal courts are bound to apply the law in a manner consistent with the laws of the state and the decisions of the highest state court. *Id.* at 78, 58 S.Ct. at 822. The duty to ascertain and apply state law binds federal courts even if the issue has not been considered by the highest court in the state. 1A–Pt 2 *Moore's Federal Practice* § 0.307[2]. The court's task in this situation was well defined by the Third Circuit in *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165 (3d Cir.1980):

> In the absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule. To make this prognostication, we are not inflexibly confined by dicta or by lower state court decisions, although we should look to such statements as indicia of how the state's highest court might decide. The policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts may also inform our analysis. In addition, we may consult treatises, the Restatement, and the works of scholarly commentators.

*Id.* at 1167 (citation omitted). More recently, the Third Circuit held that in predicting how a state supreme court would rule, the court would rely on persuasive decisions of state intermediate appellate courts unless it was convinced that the supreme court would decide otherwise. *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 113 (3d Cir.1992), *cert. denied sub nom., Doughboy Recreational, Inc., Div. of Hoffinger Indus., Inc. v. Fleck,* — U.S. —, 113 S.Ct. 1645, 123 L.Ed.2d

---

8. Section 158(a) states in relevant part that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy

judges entered in cases and proceedings referred to bankruptcy judges under section 157 of this title."

267 (1993). In other words, lower court decisions are instructive rather than binding. *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 614 (3d Cir.1992); *Dillinger v. Caterpillar, Inc.,* 959 F.2d 430, 434 n. 11 (3d Cir. 1992).

## C. Arguments of Parties

Batt opposes the imposition of an equitable lien. He argues that New Jersey law and the Agreements between the Debtor and Appellees restrict the source of real estate salespersons' commissions to funds received by the broker. Because these funds were received post-Petition, Batt claims that, as Trustee, he may avoid their transfer to Appellees.

Batt also disputes Appellees' claim that they are third-party beneficiaries of the real estate contracts. He argues that New Jersey law precludes real estate salespersons from claiming direct compensation from the sellers, and that there is no evidence that the Appellees were intended to be third-party beneficiaries of the real estate contracts. Their sole claim, argues Batt, is against the Debtor.

Appellees contend that they are entitled to an equitable lien. They argue that New Jersey courts have determined that the listing agreement between broker and seller gives brokers an equitable lien on the proceeds of a real estate sale. In addition, they claim that the brokers' equitable lien survives the filing of the Petition under *In re L.D. Patella Construction Corp.,* 114 B.R. 53 (Bankr.D.N.J.1990). Finally, Appellees contend that they are third-party beneficiaries of the listing agreement, and that they may enforce this lien on the proceeds of sale.

## D. Analysis

█ The New Jersey Supreme Court employs two guiding principles in deciding whether to grant an equitable lien. First, the Court has consistently required that the parties "inten[d] to give, charge, or pledge property, real or personal, as security for an obligation" before it will impose an equitable lien. *In re Hoffman,* 63 N.J. 69, 77, 304 A.2d 721 (1973) (citing *Rutherford Nat'l Bank v. H.R. Bogle & Co.,* 114 N.J.Eq. 571, 573–74,

169 A. 180 (Ch. 1933)); *see also Temple v. Clinton Trust Co.,* 1 N.J. 219, 225, 62 A.2d 690 (1948) (denying equitable lien where no evidence of intention to create). In considering whether such intent exists, the Court looks to the agreement between the parties. *In re Hoffman,* 63 N.J. at 76, 304 A.2d 721; *Temple,* 1 N.J. at 225, 62 A.2d 690. The Court will not impose an equitable lien where to do so "would be in defiance of the contract between the parties." *Temple,* 1 N.J. at 227, 62 A.2d 690. However, the contract does not necessarily control. In considering whether the parties have dedicated property to a particular purpose, a court sitting in "equity looks at the final intent and purpose rather than at the form." *In re Hoffman,* 63 N.J. at 77, 304 A.2d 721 (citing *Rutherford Nat'l Bank,* 114 N.J.Eq. at 573–74, 169 A. 180). If the intent exists, the "equitable lien ... will follow as of course." *Id.* Connected with the intent to create an equitable lien is the requirement that the property on which the lien is to be imposed be "particular[ly] identified." *Temple,* 1 N.J. at 226, 62 A.2d 690.

█ Second, the Supreme Court considers which party is responsible for creating the funds on which the lien is to be imposed. Accordingly, "[w]here one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence." *In re Hoffman,* 63 N.J. at 77, 304 A.2d 721; *VGR Corp. v. GKN Realty Corp.,* 261 N.J.Super. 447, 455, 619 A.2d 251 (App.Div.1993), *cert. granted,* 133 N.J. 443, 627 A.2d 1147 (1993).

█ These two central principles of equitable liens are not strict requirements. Equitable liens may be

raised *ex aequo et bono,* according to the dictates of equity and conscience, as where a contract of reimbursement could be implied at law and enforced by the action of *assumpsit,* or in certain cases where contribution or reimbursement is enforceable in equity, including those involving fraud and innocent mistake.

*Temple,* 1 N.J. at 226, 62 A.2d 690; *In re Hoffman,* 63 N.J. at 77, 304 A.2d 721. This

rule follows from the "cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done." *In re Hoffman,* 63 N.J. at 77, 304 A.2d 721 (citing *Rutherford National Bank,* 114 N.J.Eq. at 573–74, 169 A. 180).

■ Despite its reliance on this rather broad principle, the New Jersey Supreme Court is cautious about "administering abstract justice at the expense of well-settled principles." *Temple,* 1 N.J. at 227, 62 A.2d 690 (quoting *Heine v. The Board of Levee Commissioners,* 86 U.S. 655, 22 L.Ed. 223 (1874)). Thus, the Court will only enforce equitable remedies which can be said to rest on "legal obligations." *Id.*

■ The court does not have to determine whether the Agreement between the Appellees and the Debtor gives rise to an equitable lien on the commissions received by the Debtor, because even the Appellees do not press this argument.[9] Instead, Appellees argue that their lien derives from the *broker's* equitable lien. Accordingly, the court's analysis shall focus on the broker's equitable lien in New Jersey.

\*   \*   \*   \*   \*   \*

■ Several New Jersey courts have addressed the issue of equitable liens in the broker/owner context. Both parties rely on *Ellsworth Dobbs, Inc. v. Johnson,* 50 N.J. 528, 236 A.2d 843 (1967) for the proposition that brokers are entitled to an equitable lien on the proceeds of sale from a real estate contract. While the court questions the parties' interpretation of the *Ellsworth* case,[10]

the court agrees that lower courts have granted such a lien in favor of brokers. These lower court cases are instructive on this issue before the court.

In *Cohen v. Estate of Sheridan,* 218 N.J.Super. 565, 528 A.2d 101 (Ch.Div.1987), the Chancery Division granted an equitable lien in favor of a broker and against the sellers on the sellers' property and on the proceeds of sale. In so doing, the court recognized that the broker was legally entitled to the commission, having met the standards set forth in *Ellsworth. Cohen,* 218 N.J.Super. at 568, 528 A.2d 101. The court imposed the equitable lien believing that the sellers, who had entered bankruptcy, would be unjustly enriched and/or benefitted by the broker's efforts in bringing a purchaser to the table, thereby allowing them to pay off their creditors while leaving the broker unrewarded. *Id.* at 569, 528 A.2d 101.

· In granting the broker a lien, the *Cohen* court analogized the broker's position to that of a similarly situated party in *In re Hoffman. Cohen,* 218 N.J.Super. at 570, 528 A.2d 101. In *Hoffman,* the New Jersey Supreme Court granted an equitable lien in favor of an accountant on a tax refund. *Hoffman,* 63 N.J. at 78, 304 A.2d 721. In granting the lien, the *Hoffman* court noted that intent to earmark funds for payment and creation of the fund by the one seeking the lien were important factors in deciding whether to grant an equitable lien: "None of the parties has disputed that Robert Hoffman intended to pay the fee of Brooks [the accountant] from the amount received

9. Indeed, if they did, they would lose, because their right to the funds would not become due, under their Agreements with the Debtor as well as New Jersey law, until ten days after the broker received the funds. The trustee could therefore avoid the lien under his strong-arm powers because the Appellees' right to compensation would arise post-Petition. 11 U.S.C. § 544 (West Supp. 1993).

10. It would seem that in *Ellsworth,* the New Jersey Supreme Court only addressed the issue of when a broker earns his commission, not whether he is entitled to an equitable lien. The Court held that brokers earn their commissions when (a) they produce a buyer ready, willing, and able to buy on the owner's terms; (b) the purchaser enters into a binding contract with the owner, and (c) the purchaser completes the

transaction by closing the title in accordance with the provisions of the contract. *Ellsworth,* 50 N.J. at 551, 236 A.2d 843. While the issues of when a broker earns a commission and when a broker is entitled to an equitable lien are certainly related, the court finds nothing in the opinion suggesting that the Court even considered the latter issue. This conclusion is supported by the Court's finding in *Ellsworth* that the broker failed to meet the conditions requisite to earning his commission. *Id.* at 556, 236 A.2d 843. Because the broker failed to earn his commission in that case, it would have been illogical for the Supreme Court to hold that the broker was equitably, but not legally, entitled to it. Any statements with respect to equitable liens would have been mere dicta.

through the tax refund. Since the fund was created by the efforts of Brooks, we think his claim falls within the definition of an equitable lien." *Id.* In asserting their respective positions, the parties here rely to a great degree on the definition of the equitable lien which the New Jersey Supreme Court set forth in the *Hoffman* case.

The *Cohen* court also defined the precise nature of the lien. Prior to closing, when the broker's right to payment is inchoate because the factors set forth in *Ellsworth* have not yet been met, the broker's lien is against the property of the seller. *Cohen*, 218 N.J.Super. at 570, 528 A.2d 101. At closing, when the broker's right to a commission fully ripens, the broker may maintain an equitable lien on the proceeds of the sale. *Id.*

The other New Jersey decision which considered the issue of a broker's equitable lien is *VGR Corp. v. GKN Realty Corp.*, 261 N.J.Super. 447, 619 A.2d 251 (App.Div.1993), *cert. granted*, 133 N.J. 443, 627 A.2d 1147 (1993). In that case, the seller and broker agreed to satisfy the broker's commission with an initial payment against which six percent of the monthly rentals received from the property would be credited until the entire commission was paid. *Id.* at 451, 619 A.2d 251. Prior to full payment of the commission, the seller sold the property. *Id.* at 452, 619 A.2d 251. The Appellate Division granted an equitable lien in favor of the broker against the successor property owner on rent proceeds. *Id.* at 457, 619 A.2d 251. The Appellate Division rejected the trial court's finding that the rental payments were only a basis for calculating the commission due, and were not intended by the parties to serve as a security interest. *Id.* at 454, 619

A.2d 251. Indeed, the court found that the broker's compensation was "exclusively" derived from the rental income, and that the successors to the property were clearly on notice of this right. *Id.* at 451–53, 619 A.2d 251.

Like the *Cohen* court, the Appellate Division, consistent with the facts and holding in *Hoffman*, seemingly limited the right to assert an equitable lien to parties to the agreement. *Id.* at 455, 619 A.2d 251.[11] Quoting from *Pomeroy's Equity Jurisprudence*, the court stated that equitable liens can be imposed when "there exists an agreement in which: 'the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation....'" *VGR Corp.*, 261 N.J.Super. at 454–55, 619 A.2d 251. In other words, the person seeking the equitable lien must have first secured the *promise* of the other to "pay for services rendered out of a fund created in whole or in part by the efforts of the [one seeking the equitable lien]" before such a lien will arise. *Id.* at 455, 619 A.2d 251.

In this case, Batt does not challenge the broker's right to an equitable lien. Nor does this court believe that the New Jersey Supreme Court would overturn *Cohen* or *VGR Corp.* were it to consider the issue on its own. In dispute, however, is whether the lien survives the filing of the Petition. This issue requires that the Court resolve what the parties characterize as conflicting decisions within the Bankruptcy Court in the District of New Jersey.

---

11. It is true that in *Hoffman* the court also granted a constructive trust (an equitable remedy) in favor of Hoffman's ex-wife on half of the tax refunds. Although the separation agreement did not specify that Hoffman would pay child support from the proceeds received from the tax refund, the court found that Hoffman had specifically bargained for his wife's assistance in securing the tax refunds. The court found it inequitable that Hoffman could fail to perform his end of the bargain, i.e. pay child support, and then demand that his ex-wife help him obtain tax refunds to which only he was entitled.

These facts might suggest that the New Jersey Supreme Court abandoned its requirement that

the parties manifest an intent to pay an obligation from a specific fund. However, two things distinguish this scenario from the court's traditional approach to equitable liens. First, it does not appear that the Court granted Hoffman's ex-wife an equitable lien; rather, it was only a constructive trust. The same principles clearly did not control. Second, the court was clearly motivated by public policy concerns. The court reached its result "in order to protect the rights of Audrey and the children," to whom the debtor allegedly owed, in 1963 dollars, $6,007.00. In any event, the ex-wife received her equitable remedy as a party to an agreement with the debtor.

The Appellees rely on *In re L.D. Patella Construction Corp.*, 114 B.R. 53 (Bankr. D.N.J.1990). The *Patella* court addressed the issue of whether a broker's equitable lien survived the filing of the bankruptcy petition. In *Patella*, the broker and seller entered into a listing agreement. *Id.* at 55. The broker subsequently produced a buyer who entered into a contract of sale on the seller's terms. *Id.* Thereafter, the seller entered bankruptcy and sought to complete the sale while avoiding the broker's commission. *Id.* The court held that the listing agreement was not a recordable instrument under New Jersey law,[12] and that the broker's equitable lien was valid as against the bankruptcy trustee. *Id.* at 59–60. In reaching its conclusion, the court noted that brokers generally expect to be paid from the proceeds of sale. It emphasized that under *Cohen*, "the listing agreement ... creates the equitable lien. The lien is inchoate until the contingencies in *Ellsworth Dobbs, Inc. v. Johnson* have occurred, and it ripens at closing into a choate lien on the fund due to the seller." *Patella*, 114 B.R. at 59.

Appellants suggest that *In re Timberline*, 115 B.R. 787 (Bankr.D.N.J.1990) leads to the opposite result. In *Timberline*, the facts were nearly identical to those in *Patella* with the exception that the parties to the sales contract, by novation, altered the terms of the sales contract after the debtor filed its bankruptcy petition. *Id.* at 789. The court held that the broker's right to a commission remained inchoate at the time the petition was filed because the parties had not yet entered into a sales contract. *Id.* at 791. Under the Bankruptcy Code, the transfer of property, i.e. granting the broker a lien, required court approval. *Id.* As no approval had been given, the court held that the broker was not entitled to a lien. *Id.*

The *Timberline* decision is consistent with, rather than contrary to, *Patella*. In *Patella*, the court noted in a footnote that if contracts for sale had not been signed prior to the filing of the petition, the broker would have to meet the requirements of 11 U.S.C. § 327(a) and Bankruptcy Rule 2014(a) before he could be compensated. *Patella*, 114 B.R. at 60 n. 5. Appellant's reliance on *Timberline* would be correct if the Appellants were asserting a claim to a lien in their own right under their Agreement with the Debtor. In that case, their right to payment would coalesce post-Petition. However, here Appellees assert their right to a broker's equitable lien which, like that in *Patella*, was choate prior to the filing of the Petition.

The Court holds that the Bankruptcy Judge erred as a matter of law in permitting Appellees to maintain an equitable lien on the proceeds received by the Trustee. At the hearing, the Bankruptcy Judge stated that Appellees' services rendered pre-Petition

> were in fact the procuring cause for these transactions. I think an equitable lien would exist here in favor of a real estate broker to this fund. The trustee, standing in the shoes of Leahy Realty, has received these brokerage commissions. I think that ... the whole statutory scheme indicates that the rights of sales agents are derivative of those of real estate brokers. I see no reason not to apply the same equitable lien principles to real estate agents on the facts of this case ... I think they are entitled to their relief here.

Tr. at 41–42. This court reads the judge's remarks as imposing a lien after because (1) the Appellees created the fund, and (2) the broker or, in this case, the Trustee, could have asserted a lien on funds which existed in the pockets of buyers prior to the filing of the Petition. The reasoning of the judge seems to be that because the rights of real estate salespersons are derivative of those of the broker, and because the broker, had he chosen to, could have asserted a lien in this case, the Appellees may do the same. Nei-

---

**12.** This finding was significant. If the listing agreement was a recordable instrument, then the bankruptcy trustee could avoid the lien because the listing agreement was never recorded. *Patella*, 114 B.R. at 58. The same holds true even though under New Jersey law the equitable lien would be valid as against subsequent judgment creditors. *Id.* If the listing agreement was not recordable, then the debtors would have to satisfy the commission debt in the event that the property was sold. *Id.*

ther argument gives Appellees an equitable lien.

Claiming that Appellees helped create the fund does not serve Appellees' cause. Under *Hoffman*, the lien "will attach to the fund *when it comes into existence.*" *Hoffman*, 63 N.J. at 77, 304 A.2d 721. Appellees' Agreement with the broker specifically stated that payment would not be due until ten days after they were received by the broker. In this case, the starting point of that time period fell post-Petition, whereby the Trustee could avoid the transfer of property to Appellees under the strong-arm powers. 11 U.S.C. § 544(a)(1). The facts in *Hoffman* do not dictate a contrary result. In *Hoffman*, the tax refund checks created through the accountant's efforts were received by Hoffman more than two years before Hoffman's estate was adjudged to be bankrupt. The Court therefore did not have to consider, as this court must, the impact of the filing of the bankruptcy petition. The impact under federal law is that the Trustee may defeat the lien. 11 U.S.C. § 544(a)(1). Therefore, stating that Appellees created the fund does not advance their claim.

Indeed, that is why Appellees do not assert an equitable lien in their own right; they seek the broker's equitable lien, because the broker's right to payment from the seller, inchoate though it was, formed before the Petition was filed. However, the "derivative right" argument posited by the Bankruptcy Judge also cannot stand. During the hearing, the judge stated that "The funds that I think existed before Mr. Batt had his hands on it, and let's assume ... Mr. Batt [made] the claim of a broker's lien on the fund, couldn't he do that?" Tr. at 38–39. The judge was evidently trying to argue that the Trustee was in the position of the broker *prior* to the filing of the Petition and that, as broker, he could have asserted a lien against *funds* still in the hands of the buyer. However, contrary to the argument advanced by the judge at the hearing, a broker's inchoate lien is against the *property* of the seller, not the funds which will eventually be used to purchase the home but still remain in the hands of the buyer. *Cohen*, 218 N.J.Super. at 570, 528 A.2d 101. Second, and most importantly, Leahy's equitable lien *expired*

when the sellers paid the commissions to the Trustee. Even if the broker had an inchoate lien which arose by virtue of the fact that contracts of sale existed, and the agents helped create those contracts, there simply was no lien for Appellees to enforce once the sellers paid the commissions to the Trustee. The fact that the funds were paid post-Petition precludes Appellees from asserting their claim here.

The Bankruptcy Judge interpreted the derivative nature of the real estate statutes too broadly in claiming that it gave Appellees an equitable lien. N.J.S.A. 45:15–16 states that "[n]o real estate salesman shall accept a commission ... for the performance of any of the acts herein specified, from any person except his employer, who must be a licensed real estate broker." N.J.S.A. 45:15–3 also prevents actions by brokers or salesmen to recover commissions unless they are "a duly licensed real estate broker." In *Harper–Lawrence, Inc. v. United Merchants and Manufacturers, Inc.*, 261 N.J.Super. 554, 619 A.2d 623 (App.Div.), *cert. granted*, 134 N.J. 478, 634 A.2d 525 (1993), the Appellate Division ruled that "[b]y virtue of these statutes, if [one acts as] a 'real estate salesman,' and not a 'broker,' ... he has no cause of action against anyone except [his broker]." *Id.*, 261 N.J.Super. at 566, 619 A.2d 623. While the statutory scheme may be derivative in other respects, under *Harper–Lawrence* there is no derivative right where the right to payment is concerned. The Court finds the *Harper–Lawrence* decision persuasive and is not convinced that the New Jersey Supreme Court would decide otherwise. *See Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 113 (3d Cir.1992).

Appellees answer this argument by claiming that if they are intended beneficiaries of broker's lien or the listing agreement which gives rise to the lien, see *Patella*, 114 B.R. at 59, then they should have the protection of the broker's lien. This argument too is unpersuasive.

In support of their "beneficiary of the lien" argument, Appellees cite *In re Rivas and Rivas*, 65 B.R. 167 (Bankr.D.Del.1986). In that case, Rivas and Rivas received a permit

from the county government to construct a sewer. *Id.* at 168. DiBiase, a developer who was admittedly a third-party beneficiary of that agreement, sought to enforce an equitable lien against Rivas and Rivas for various outstanding debts. *Id.* at 168–69. The court stated, without citing any law, that if the government had a lien, then so did DiBiase. *Id.* at 169. However, the court did not find a lien in favor of the government and characterized DiBiase's claim as unsecured. *Id.*

Assuming *In re Rivas and Rivas* to be a correct statement of the law,[13] it seems that Appellees must first prove they were intended beneficiaries of the listing agreement between the Debtor and the sellers. As the foregoing analysis reveals, Appellees were not intended beneficiaries of the listing agreements.

The New Jersey Legislature codified the common law to permit persons who are intended third-party beneficiaries of a contract to sue on that contract. N.J.S.A. 2A:15–2. In *Brooklawn v. Brooklawn Housing Corp.,* 124 N.J.L. 73, 11 A.2d 83 (1940), the New Jersey Court of Errors and Appeals discussed at length the right to be considered a third-party beneficiary:

> "[New Jersey law does not] permit a suit upon a contract to be maintained by persons with whom the defendant never meant to enter into contractual relations. *It is not enough that the plaintiff may be benefited by the performance of the contract.* He can only maintain the action when the contract is made for him...."
>
> ... [I]t seems quite clear that the rule is well settled that before one not privy to a contract can maintain an action upon it, it must appear that the contract was made for his benefit and so intended.
>
> The determining factor as to the rights of a third party beneficiary is the intention of the parties who actually made the con-

tract. They are the persons who agree upon the promises, the covenants, the guarantees; they are the persons who create the rights and obligations which flow from the contract. The statute merely provides a means of legal procedure when once it has been determined who has an actionable right under the agreement. *Thus, the real test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts; and the fact that such a benefit exists, or that the third party is named, is merely evidence of this intention.*

*Id.* at 76–77, 11 A.2d 83 (emphasis added) (citations omitted). The New Jersey Supreme Court continues to apply these same principles. *See Broadway Maintenance Corp. v. Rutgers State Univ.,* 90 N.J. 253, 259–60, 447 A.2d 906 (1982). As evidence of the necessary intent, Appellees point to the Broker/Agent Agreements, and specifically, the termination provisions of the Agreements. The termination provisions state that if an agent was terminated after the signing of a listing agreement, the agent still had a right to a commission provided that the listing agreement produced a contract of sale which closed.[14] Appellees argue that these provisions give them a vested right to receive compensation. They also argue that the limits on the source of their compensation—either contractual or statutory—only enhances the argument that they are intended beneficiaries of the broker's equitable lien. Because they cannot perfect a security interest in their commissions, Appellees argue that equity must intervene to protect them as it does the broker.

The Court finds no intent between the parties to the listing agreements or the sales contracts to give Appellees "a benefit which might be enforced in the courts." As the

---

**13.** In light of the fact that no lien existed, the court's language is pure dicta, which, as the Third Circuit has stated, need not be followed. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (1980). Appellees cite no other authority for their "beneficiary of the lien" theory. It seems to the Court that the "beneficiary of the lien" argument fails for the same reason as the Bankruptcy Judge's decision is in error. As was discussed above, the

broker's lien in this case terminated when the seller paid the funds. There simply was no lien of which Appellees could be the beneficiaries.

**14.** These contracts do not appear in the record before the Court. However, the Trustee does not dispute the terms of the contract in his Reply Brief to this Court.

Trustee points out, there is no language in any of the sales contracts or listing agreements which even refers to Appellees. Indeed, it would seem highly unlikely that the parties to these agreements looked beyond their obligation to pay the broker his fee. They were unconcerned with the payment obligations that existed between broker and agent. Their only concern, as is noted by Appellees, was whether to proceed with the respective sales of property in light of the broker's decision to file bankruptcy.

In addition, the termination provisions do not, as Appellees contend, indicate an intent to make Appellees third-party beneficiaries of the listing agreements. Two reasons support this conclusion. First, the termination provisions exist outside the listing agreements. It is hard to imagine that the parties to the listing agreements would have manifested their intent to benefit Appellees in an extraneous document, particularly when the sellers did not care what payment arrangements existed between their broker and his agent. Second, the termination provisions actually suggest that Appellees are unsecured creditors. The termination provisions only provide Appellees with a claim against their broker for commissions. These claims have not been reduced to judgment. A non-judgment creditor must wait in line with the other unsecured creditors.

Other reasons support a finding that Appellees were not intended beneficiaries of the listing agreement. It would seem that under the legislative scheme interpreted in *Harper–Lawrence*, a real estate agent could almost never be a beneficiary of a listing agreement. As *Harper–Lawrence* stated,

the agent's only claim is against the broker. *Harper–Lawrence*, 261 N.J.Super. at 566, 619 A.2d 623. The mere fact that Appellees would be benefited by the sellers' performance under the listing agreement does not give them the right to sue on that agreement. *Brooklawn*, 124 N.J.L. at 77, 11 A.2d 83.

Therefore, in accordance with all of the reasons set forth above, the Court holds that the New Jersey Supreme Court would not grant Appellees an equitable lien. Instead, the Appellees remain unsecured creditors of the Debtor.[15]

The court's conclusion is consistent with the policy of the New Jersey legislature. *See Pennsylvania Glass Sand*, 652 F.2d at 1167 (in predicting how state court would rule, federal court should consult underlying policies of the law). That governmental body enacted a comprehensive regulatory scheme with respect to real estate brokers and agents. With a clear understanding of the relationship that exists between broker and agents, it passed a law which restricted the source of an agent's funds to its broker. It provided that only a licensed broker could sue to recover commissions from the selling public. N.J.S.A. 45:15–3. Clearly, the legislature wished to avoid the situation where numerous agents sue to recover commissions when no contractual relationship exists between themselves and sellers. Such a situation would be beyond the expectations of the sellers who had only contracted with the broker. Moreover, under the result Appellees seek, real estate salespersons could

---

**15.** This court, while it recognizes that its guiding principles are to come from the New Jersey Supreme Court, takes some comfort in the fact that other courts have reached the same result in similar circumstances. *See Johnson v. CMT Holding, Ltd.*, 149 B.R. 993 (Bankr.M.D.1993) (holding that real estate agent who secured sales contract pre-petition which closed post-petition was mere unsecured creditor of listing broker who entered bankruptcy; agent did not have an equitable interest in the proceeds), *aff'd sub nom., Harrington v. Johnson*, 157 B.R. 493 (M.D.Fla.1993); *Wagner & Truax Co. v. Barnett Enterprises, Inc.*, 447 So.2d 1255 (La.Ct.App. 1984) (holding that selling broker was not intended third-party beneficiary of listing agree-

ment between listing broker and seller); *Lewis v. Foppiano*, 150 Cal.App.2d 752, 310 P.2d 658 (1959) (holding that where one broker entered into listing agreement with seller, agent who entered into an agreement with broker to split commissions on sale of property was not entitled to sue seller to recover commissions even though agent procured the seller). While this court does not rely on these cases in reaching its decision, it finds them instructive because they are consistent with the result that it believes the New Jersey Supreme Court would reach here. *See Pennsylvania Glass Sand*, 652 F.2d at 1167 (federal court may consult decisions of other state courts in predicting how state court would rule).

avoid a decision by their broker not to pursue a commission.[16]

To permit real estate agents to pursue the broker's equitable lien as against the seller's property or proceeds of sale would contravene the intent of the New Jersey legislature. In order to grant Appellees the lien, this Court would have to rule that they were beneficiaries of the listing agreement. Such status would give them the right to sue under N.J.S.A. 2A:15-2, which right was *denied* Appellees under N.J.S.A. 45:15-3 and N.J.S.A. 45:15-16.

### III. CONCLUSION

For the forgoing reasons, the decision of the Bankruptcy Court is reversed. The case is remanded for further proceedings consistent with this Opinion.

### .ORDER REVERSING DECISION OF BANKRUPTCY COURT

This matter having come before the Court on the appeal of Appellant from a final order of the United States Bankruptcy Court; and

After careful review of the record and having considered the submissions of the parties; and

For the reasons set forth in the Court's Opinion of this date;

**IT IS** on this 10th day of May, 1994, hereby **ORDERED** that the judgment of the United States Bankruptcy Court is **RE-VERSED.** The case is remanded for fur-

ther proceedings consistent with this Court's Opinion.

---

**16.** This result was the one which the Appellate Division implicitly sought to avoid when it decided *Harper–Lawrence*, 261 N.J.Super. 554, 619 A.2d 623 (A.D.1993). The *Harper–Lawrence* decision follows the intent of the legislature. In that case, Jamie Weiss ("Weiss") was employed by the real estate brokerage firm of Cushman & Wakefield ("Cushman"). *Harper–Lawrence*, 261 N.J. at 565, 619 A.2d 623. Like the agreements in the case at bar, Weiss' agreement with Cushman stated that he could only receive compensation from Cushman. *Id.* at 566, 619 A.2d 623. During his employment, Weiss secured a cobrokerage agreement between Cushman and the real estate brokerage firm of Harper–Lawrence, Inc. *Id.* at 560, 619 A.2d 623. The two firms agreed to find a building suitable for United Merchants and Manufacturers, Inc. ("United").

*Id.* Weiss found a space agreeable to United, but United stalled in executing an agreement with the owner of the building, Gibbons. *Id.* at 562, 619 A.2d 623. However, without the assistance of Weiss, Harper—Lawrence, or Cushman, United subsequently executed a contract with Gibbons. *Id.* at 564, 619 A.2d 623. Gibbons and United refused to pay a commission, and Harper–Lawrence sued to recover its fees. *Id.* at 557, 619 A.2d 623. Cushman did not file suit and did not seek a commission, but Weiss did. *Id.* at 558, 619 A.2d 623.

The Appellate Division upheld the grant of summary judgment against Weiss. It held that Weiss' agreement with Cushman as well as N.J.S.A. 45:15-16 and N.J.S.A. 45:15-3 precluded his suit to recover a commission against anyone but Cushman. *Id.* at 565-67, 619 A.2d 623.