13 F.3d 321
 62 USLW 2422, 25 Bankr.Ct.Dec. 152, Bankr.
L. Rep. P 75,708
 In re UNICOM COMPUTER CORPORATION, aka Unicom Communications
Corporation, NCH Corp., and Unicom Capital
Corporation, Debtor.
MITSUI MANUFACTURERS BANK, Appellant,
v.
UNICOM COMPUTER CORPORATION, Appellee.
 No. 92-15165.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 12, 1993.
Decided Jan. 5, 1994.
 
 Sanford Svetcov and L. Joanne Sakai, Landels, Ripley & Diamond, San Francisco, CA, for appellant.
 Merle C. Myers and Constance L. Kleiner, Goldberg, Stinnett & MacDonald, San Francisco, CA, for appellee.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel.
 Before: CHOY, HUG, and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 
 1
 In this appeal we are called upon to decide whether a debtor's prepetition transfer to a creditor of money belonging to the creditor but mistakenly received by the debtor constitutes a voidable preference because the debtor had temporary possession of the money within ninety days of the filing of its petition in bankruptcy. The Bankruptcy Appellate Panel ("BAP") upheld the bankruptcy court's ruling that, for purposes of bankruptcy law, the debtor's prepetition transfer of the payment to its rightful owner constituted a voidable preference. We reverse.
 
 FACTS AND PRIOR PROCEEDINGS
 
 2
 Acting as a computer equipment broker on behalf of its client, Pitney Bowes, Inc. ("Pitney"), Unicom Computer Corporation ("Unicom") arranged a computer equipment lease in early 1983 between Pitney and Mitsui Manufacturers Bank ("Mitsui"). Under the terms of the agreement worked out by Unicom, Mitsui purchased computer equipment financed in part by the Philadelphia Savings Fund Society ("PSFS"). Mitsui then leased the equipment to Pitney for five years (i.e., between March 1983 and February 1988) at a monthly rental of $44,197. Pitney made its monthly lease payments directly to PSFS, which in turn remitted to Mitsui the difference between Pitney's rent and the amount of Mitsui's monthly loan obligation to PSFS.
 
 
 3
 Midway through the lease term, Pitney told Unicom that it wanted to get out of the five-year lease. Although unable to locate a party willing to step into Pitney's shoes and re-lease the equipment at the $44,197 monthly rental figure, Unicom did find a company, Cincinnati Milacron ("Cinci"), willing to sublease it for two years at a substantially reduced rent. Pursuant to a deal worked out by Unicom, Pitney consented to sublet the equipment directly to Unicom for twenty-four months at a monthly rental of $20,000. Unicom in turn sub-sublet the equipment to Cinci for the same time period (i.e., between January 1986 and December 1987) at a monthly rental of $22,000.[1]
 
 
 4
 Because the PSFS-Mitsui equipment purchase loan was scheduled to be paid off in December 1987, a full two months before the expiration of the Mitsui-Pitney equipment lease, Pitney's final two payments were to be sent directly to Mitsui rather than to PSFS.[2] Unicom failed to bill Pitney for those final two payments until late April 1988, nearly two months after the five-year lease term had expired. Unicom then compounded its error by instructing Pitney to send its payment to Unicom instead of to Mitsui. As a final complication, Unicom did not forward Pitney's check to Mitsui but deposited it to its own (i.e., Unicom's) account.
 
 
 5
 Unicom corrected its mistake in August 1988 by remitting the full amount of Pitney's misdirected payment to Mitsui; the following month, Unicom filed a Chapter 11 petition in bankruptcy.[3] Nearly two years later Unicom filed the instant adversary proceeding against Mitsui, arguing that its August 1988 payment constituted a voidable preference because it had been made within ninety days of the bankruptcy petition's filing. Mitsui countered by arguing that the payment could not be viewed as a preference, voidable or otherwise, because the money was never Unicom's property, i.e., Unicom never had any right to the money and was merely holding it in constructive trust for Mitsui.
 
 
 6
 The bankruptcy court rejected Mitsui's argument, holding that it would be inequitable to impose a constructive trust over the money represented by Pitney's misdirected payment because, inter alia, the funds had been deposited to a general operating account over which Unicom had complete control. The BAP affirmed in a 2-1 decision, holding that, while a constructive trust would ordinarily arise under California law in favor of Mitsui, Mitsui had failed to prove that the equities involved mandated such a result under federal bankruptcy law. Judge Russell said in dissent that, once Mitsui had established its right to the money, the burden of proof shifted to Unicom as the debtor-in-possession to prove that it would be inequitable to impose a constructive trust over the funds belonging to Mitsui. Mitsui has timely appealed.
 
 ANALYSIS
 Standard of Review
 
 7
 Because we are in as good a position as the BAP to determine the propriety of the bankruptcy court's rulings, we independently review the bankruptcy court's decision. See 550 West Ina Rd. Trust v. Tucker (In re Tucker), 989 F.2d 328, 330 (9th Cir.1993). We examine the bankruptcy court's findings of fact under the clearly erroneous standard and review de novo its conclusions of law. See id.Discussion
 
 
 8
 Although the parties have asserted at least three issues on appeal, this case stands or falls on the answer to one question: Does the fact that Unicom acquired temporary possession of Pitney's final lease payment to Mitsui render that payment Unicom's property for bankruptcy purposes? For the reasons which follow, we conclude that it does not.
 
 
 9
 One of the ways in which federal bankruptcy law seeks to equalize the positions of similarly situated creditors is by giving trustees in bankruptcy the power to set aside so-called preferential transfers of a debtor's property. Thus, a trustee may ordinarily avoid a transfer of a debtor's interest in property made to a creditor on account of an antecedent debt if that transfer occurred within ninety days of the date of the filing of the debtor's bankruptcy petition. 11 U.S.C. Sec. 547(b).[4] Put another way, a transfer may be avoided under section 547(b) if it involves property of the debtor and the transfer reduces the amount of the bankruptcy estate available for the payment of other creditors. Kupetz v. United States (In re California Trade Tech. Schs., Inc.), 923 F.2d 641, 645 (9th Cir.1991).
 
 
 10
 The key, of course, lies with the correct definition of "property". In its simplest terms, property of the debtor may be said to be that which would have been property of the bankruptcy estate had the transfer not taken place. Begier v. I.R.S., 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). The relevant statute broadly--and somewhat unhelpfully--defines property of a debtor's estate as including "all legal or equitable interests of the debtor in property". 11 U.S.C. Sec. 541(a)(1). However, it does not include "any power that the debtor may exercise solely for the benefit" of another, 11 U.S.C. Sec. 541(b)(1), nor does it include "[p]roperty in which the debtor holds ... only legal title and not an equitable interest". 11 U.S.C. Sec. 541(d). Thus, something held in trust by a debtor for another is neither property of the bankruptcy estate under section 541(d), nor property of the debtor for purposes of section 547(b). Begier, 496 U.S. at 58-59, 110 S.Ct. at 2263; Sierra Steel, Inc. v. S & S Steel Fabrication (In re Sierra Steel, Inc.), 96 B.R. 271, 273 (Bankr.9th Cir.1989).
 
 
 11
 In the instant case, of course, we are dealing with a particular type of trust, viz., a constructive trust that allegedly arose by operation of state law. Although we have never expressly held that the same rule (viz., funds held in trust are property neither of the debtor nor of the bankruptcy estate) should apply as well to situations involving funds held by a debtor in constructive trust, the rule would seem to apply with equal force to both situations. For example, the legislative history to section 541 indicates that property held in constructive trust should not be considered property of the debtor:
 
 
 12
 Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed.
 
 
 13
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6324; S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5868. See also Danning v. Bozek (In re Bullion Reserve of N. Am.), 836 F.2d 1214, 1217 n. 3 (9th Cir.) (dictum), cert. denied, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); In re Sierra Steel, Inc., 96 B.R. at 273.
 
 
 14
 In Torres v. Eastlick (In re North Am. Coin & Currency, Ltd.), 767 F.2d 1573 (9th Cir.), amended by order, 774 F.2d 1390 (1985), cert. denied, 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986), however, we ruled that property which might, under operation of state (viz., Arizona) law, have been deemed to be held in constructive trust by the debtor was actually property of the debtor for purposes of federal bankruptcy law. In reaching that conclusion we noted that, although Arizona law provided for the imposition of a constructive trust only in situations involving active misconduct on the part of the debtor amounting to fraud and this position was not inconsistent with federal bankruptcy law, nothing appeared from the record that would warrant the imposition of a constructive trust in favor of the disgruntled former investor-creditors. 767 F.2d at 1575-76.
 
 
 15
 The facts of the instant appeal are distinguishable. Unlike the situation presented in In re North Am. Coin & Currency, Ltd., in which the debtor had routinely and in the proper course of its business accepted money from clients for purchasing precious metals, Unicom never had any right to accept Pitney's check on behalf of Mitsui. Moreover, California law differs from Arizona law in that, while the latter recognizes only active misconduct as a ground for imposing a constructive trust in favor of creditors, see 767 F.2d at 1575, California law provides for the imposition of a constructive trust in a situation involving simple negligence on the part of a debtor who wrongfully detains another's property. See Cal.Civ.Code Secs. 2223, 2224; Toys "R" Us, Inc. v. Esgro, Inc. (In re Esgro, Inc.), 645 F.2d 794, 797 (9th Cir.1981); GHK Assocs. v. Mayer Group, Inc., 224 Cal.App.3d 856, 878, 274 Cal.Rptr. 168, 182 (1990); 11 B.E. Witkin, Summary of California Law: Trusts, Secs. 305(2), 306(2) (9th ed. 1990).
 
 
 16
 It cannot be denied that the money represented by Pitney's misdirected check belonged to Mitsui, not Unicom. Moreover, it is clear that Unicom, having wrongfully and by virtue of its own mistake(s) acquired and retained funds properly belonging to Mitsui, had at most only a bare legal title to those funds. Once Mitsui had established as a matter of state law that grounds properly existed for imposing a constructive trust over those funds, it was up to Unicom as the debtor-in-possession to prove that it would be inequitable as a matter of federal bankruptcy law to impose a constructive trust over those funds.[5] This Unicom has failed to do. Because we find nothing that would warrant overriding the dictates of California law in favor of some unspecified, overarching principle(s) of federal bankruptcy law, we hold that a constructive trust in favor of Mitsui arose over the funds represented by Pitney's misdirected check.[6]
 
 
 17
 Accordingly, the decision appealed from is REVERSED.
 
 
 
 [1]
 During the course of its sublease, Unicom billed Cinci each month for $22,000. Upon receipt of Cinci's payment, Unicom forwarded $20,000 to PSFS and kept $2,000 for itself as a broker's commission. Unicom then "billed" Pitney for $24,197, reflecting the difference between Pitney's $44,197 monthly lease obligation to Mitsui (payable to PSFS) and Unicom's $20,000 monthly sublease payment to PSFS. However, these monthly invoices to Pitney were informational only, i.e., Unicom noted thereon that Pitney was to send its $24,197 payment directly to PSFS
 
 
 [2]
 Cinci extended its sublease from Unicom through March 1988, thereby reducing the actual amount of Pitney's final payment to Mitsui to $64,197
 
 
 [3]
 Although Mitsui has not explicitly accused Unicom of any deliberate misconduct in this affair, our reading of the record indicates that something more than excusable neglect may be involved here. For example, Unicom cancelled its original final billing to Pitney which correctly directed that payment be made to Mitsui and substituted one instructing Pitney to send its payment to Unicom instead; then, despite having received prior notice from Wedbush Leasing, Inc., Mitsui's leasing portfolio manager, that its final billing was in error, Unicom deposited Pitney's check to its own account, anyway; and, finally, Unicom did not correct the situation for five weeks, when it sent Mitsui a check for the $64,197 it had received from Pitney
 
 
 [4]
 Section 547(b) reads in its entirety: "(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made--(A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if--(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."
 
 
 [5]
 On the facts of this case we hold that, to the extent Mitsui was required to "trace" its money wrongfully withheld by Unicom, see In re Esgro, Inc., 645 F.2d at 797-98; In re Sierra Steel, Inc., 96 B.R. at 273-74, it has done so
 
 
 [6]
 In reaching this conclusion we necessarily reject the BAP majority's holding that our opinion in In re North Am. Coin & Currency, Ltd. created an elaborate, multi-part test to determine whether and under what circumstances a constructive trust may be imposed on property of a debtor or of a bankruptcy estate. Our decision in In re North Am. Coin & Currency, Ltd. should not be read as saying more than what it actually says; viz., that while state law must be the starting point in determining whether a constructive trust may arise in a federal bankruptcy case, that law must be applied in a manner not inconsistent with federal bankruptcy law