In re PAULEY & McDONALD, INC., Realtors, Debtor.

v.

Roger W. BROWN, Trustee, and Stockman's Bank, Plaintiffs,

v.

CAPITAL TITLE AGENCY; et al., Defendants.

Don SOMMERS; et al., Counterclaimants,

v.

Roger W. BROWN, Trustee for Debtor, Counterdefendants,

Don SOMMERS; et al., Crossclaimants,

v.

CAPITAL TITLE AGENCY; et al., Crossdefendants.

Bankruptcy Nos. 95–02965–PCT–SSC. Adversary No. 95–553.

United States Bankruptcy Court, D. Arizona.

July 31, 1996.

Michael L. Rubin, Rubin & Rubin, Phoenix, AZ, for Defendants.

Michael P. Lane, Elizabeth C. Amorosi, Brandes, Lane & Joffe, Phoenix, AZ, for First American Title.

Michael Redding, Flagstaff, AZ, Chapter 7 Trustee.

John Graham, Regional Counsel First American Title, Phoenix, AZ, for First American Title.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

### I. *Preliminary Statement*

This matter comes before the Court upon the Motion for Summary Judgment filed by twenty real estate agents (the "Agents") formerly employed by Pauley & McDonald, Inc. (the "Debtor"), the Cross Motion for Summary Judgment filed by ROGER BROWN, the Chapter 7 Trustee (the "Trustee"), and the separate Cross Motion for Summary Judgment filed by STOCKMEN'S BANK, CoPlaintiff with the Trustee (the "Bank"). Oral argument was held on February 9, 1996. Thereafter, the Court took the matter under advisement.

This memorandum decision constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure* ("RBP"). This is a "core"

1. The Court notes that although the parties agree from a factual standpoint that the commission was not earned until the closing of a real estate transaction, this is not a correct analysis of Arizona law.

2. The title companies involved and the amount of the commissions being held are as follows:

    a) Capital Title Agency        $26,800.00
    b) First American Title Agency
       of Yavapai, Inc.            $35,804.00
    c) WesTitle Agency, Inc.        $ 6,327.00

proceeding, and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

### II. *Factual Discussion*

The Debtor is a real estate brokerage firm which conducted business in Prescott, Arizona. On April 22, 1995, the Debtor filed a Chapter 7 bankruptcy petition, and Roger Brown was appointed the Trustee.

Benjamin Filer, a licensed Arizona real estate broker, was the real estate broker for the Debtor from April 1, 1992 through December 28, 1994. Twenty individuals worked for or were associated with the Debtor as independent sales persons or Agents for the purpose of selling real estate in Yavapai County.

Each of the Agents executed an independent contractor agreement ("Agreement") with the Debtor. During 1994 and 1995, each of the Agents participated in the sales of certain parcels of real property, including the opening and closing of escrows with various title companies. From a factual standpoint, the parties agree that after the closing of the real estate transaction, the Agent's commission was deemed "earned."[1] The Debtor negotiated with the Agent as to the amount of the commission to be earned by the Debtor and the amount to be earned by the Agent. The commission owed to the Agent varied between 50 to 100 percent of the actual commission earned in the real estate transaction.

By the time of the filing of the Debtor's bankruptcy petition, all of the escrows had closed and all of the commissions had been earned by the twenty individual Agents.

Various title companies held certain commissions at the time the Debtor filed its bankruptcy petition.[2] In some cases, certain

    d) Transamerica Title Insur-
       ance Company                $ 1,249.00
    e) Capital Title Agency (turned
       over to the Trustee)        $ 5,055.00
    f) Yavapai–Coconino   Title
       Company (turned over to
       the Trustee)                $28,297.20

Docket Entry No. 18. Although the Agents initially named Yavapai–Coconino Title Company as a third party defendant in this adversary proceeding, on October 27, 1995 they voluntarily dismissed Yavapai–Coconino Title Company after

title companies are still holding the commissions.[3]

The Agreement stated that all fees earned by the Agents, who were described as "contractors," were to be collected by the Debtor and transmitted to the Agent.[4] The Agreement provides:

> All listings [of real estate] and employment agreements shall become and remain the exclusive property of the [Debtor]. All listings and employment agreements shall be shared with all other contractors of the [Debtor] and contractor shall have the right to utilize the listings and all other facilities similarly given to the [Debtor] by other contractors.[5]

The Agreement further provided that

> the sales, plans, programs, materials, manuals, rosters, forms, contracts, agreements, brochures, and other training, listing and sales materials provided by the [Debtor] are the exclusive property of the [Debtor] and shall not be utilized in connection with any business hereafter carried on by contractor. . . . [6]

The Debtor provided each Agent with office or desk space, a reception area, information on all of the Debtor's listings, forms, a telephone and other means of communication.[7] As a result of the Agents' utilizing or having access to all owned listings and the services provided by the Debtor to the Agents, the Debtor collected franchise, errors and omissions, or other fees from any "gross commission" paid to the Debtor at the close of escrow of a real estate transaction.[8]

By the end of 1994, the Debtor was winding up its business operations. On December 28, 1994, the only designated broker for the Debtor resigned.[9] At that time, the designated broker alleges that he forwarded letters to the various title companies as to the escrows that had closed designating the commissions to be paid to the Agents.[10]

Although the Agents alleged that certain individuals earned "100 percent" of any gross commission collected, no Agreement was presented that reflected that percentage recovery as to any Agent, nor did an affidavit or other competent evidence reflect such "100 percent" commission. The difficulty with the Agents' position is that although the Agents presented a form letter executed by the designated broker around December 21, 1994, stating that the Debtor would receive 25 percent of the gross commission and the designated broker on behalf of the Debtor would "irrevocably assign and disburse" to three Agents equally the remaining 75 percent of the commissions, the letter does not state the name of the title company involved, the precise amount of commissions to be disbursed to the three Agents, or the escrow number of the real estate transaction which was closed.[11]

---

it turned over all funds held by it to the Trustee. Docket Entry No. 21.

**3.** Docket Entry No. 18.

**4.** Docket Entry No. 18, B, Ex. A thereto, ¶ 3B.

**5.** *Id.* ¶ 4A.

**6.** *Id.* ¶ 8A.

**7.** *Id.* ¶ 3A.

**8.** *Id.* at 8, "Division of Commissions," last full ¶. The Agreement actually states:

> Commission divisions are based upon the dollar amounts paid to the [Debtor] and reflect the listing or selling portion or both, whichever the [A]gent generated. Co–broke is customarily paid by the escrow company; then outgoing referral (if any) is deducted to establish the "gross commission" to the [Debtor] (called G.C.I. or Gross Commission Income). Franchise fees, if any, on all properties are comput-

ed on GCI but deducted after the split. Errors & Omissions fees are deducted before the split. Referrals between the [Debtor's] [A]gents are based upon receiving agent income [agent dollar], deducted after the split. Referrals count for the referring Agent's production level. The [A]gent's level is determined at the first of each month, based upon the previous 12 months G.C.I. production, and all escrows opened during that month will be calculated at that level, regardless of when the closing takes place.

**9.** Docket Entry No. 18, Ex. B, ¶ 2.

**10.** *Id.,* Ex. B, ¶ 11 and Ex. B thereto.

**11.** Docket Entry No. 34, Ex. A. The Agents did attach a one–page summary sheet exhibit to their reply to their motion for summary judgment and as a part of their response to the Trustee's cross motion for summary judgment. The summary sheet sets forth a listing of the title companies, the escrow numbers, the closing dates, the Agents involved, and the commissions to be paid

Moreover, on January 9, 1996, the designated broker filed yet another affidavit with the Court, this time for the Bank, noting that when commissions were received, they were deposited into the general corporate account of the Debtor to be disbursed subsequently to the Agents according to the Agreements.[12] Therefore, the December 21, 1994 letter forwarded by the designated broker was not consistent with the regular or ordinary business practice of the Debtor.[13]

### III. *Issues Presented*

This Court must resolve the issue of whether the commissions earned prepetition by the Agents became property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541. The parties have requested that the Court consider a number of subissues including:

A. Whether a prepetition trust was created by agreement of the parties or pursuant to Arizona law.

B. Whether a prepetition bailment existed between the Agents and the Debtor or the title companies and, if so, whether any such property became property of the bankruptcy estate.

C. Whether the fact that the commissions were "earned" prepetition removes the

commissions as property of the Debtor's estate.

### IV. *Discussion*

A. Whether a prepetition trust was created by agreement of the parties or pursuant to Arizona law.

■ The Agents argue that a prepetition trust was created between the Agents and the Debtor, that the title companies held the commissions which constituted the property of the trust, and that the commissions never became property of the Debtor's bankruptcy estate.

■ 11 U.S.C. § 541(a)(1) provides that the Debtor's estate, at the time the bankruptcy petition is filed, includes tangible and intangible property and any claims that the Debtor has against third parties which are liquidated or unliquidated.[14] Property becomes a part of the bankruptcy estate even though it is not in the Debtor's possession at the time of the filing pursuant to 11 U.S.C. § 541(a)(1) & (3).[15] Certain express trusts which are created pursuant to applicable state or federal law are excluded as property of the estate pursuant to 11 U.S.C. § 541(c)(2).[16] Under 11 U.S.C. § 541(d), if

---

to the Debtor and to each Agent. There is no indication who prepared the exhibit, what books and records were reviewed to prepare it, whether the exhibit is admissible in evidence as a business records' exception to the hearsay rule (or on some other basis), what underlying Agreements support the payment of any commissions to any of the Agents, what underlying documents support the closing date, and other conditions of the escrows outlined in the exhibit. *Id.,* Ex. B.

**12.** Docket Entry No. 44.

**13.** The Trustee also attached a letter from the Debtor's counsel to one of the title companies, dated December 27, 1994, directing that all commissions received on any real estate transaction be forwarded only to the Debtor. However, no affidavit was submitted concerning this letter, and this letter is currently inadmissible in evidence. Docket Entry No. 28, page 2 of documents attached thereto.

**14.** 11 U.S.C. § 541(a)(1) states:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541(a)(1) (1996).

**15.** *11 U.S.C. § 541(a)(3) states:*

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: ˙

(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

11 U.S.C. § 541(a)(3) (1996). *See also* note 14, supra.

**16.** A spendthrift trust created pursuant to *Ariz. Rev.Stat. Ann.,* §§ 14–7701, 14–7702 (West 1996), or a qualified pension plan trust as described in *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), are excluded by operation of 11 U.S.C. § 541(c)(2), which states:

A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforce-

an express trust is created and the Debtor only holds legal title to the property pursuant to the terms of the trust, then the property becomes part of the bankruptcy estate only to the extent of the Debtor's limited interest and the equitable or beneficial interest in the property held by a third party never becomes part of the bankruptcy estate.[17] Trusts may also be imposed by operation of law to effectuate the intent of the parties, or they may be imposed as an equitable remedy to correct a fraud or injustice.[18]

◼ Although the Court must analyze federal law to determine what constitutes property of the estate under 11 U.S.C. § 541, it must also review Arizona law to determine whether an express trust, a trust imposed by operation of law, or a trust imposed as an equitable remedy has been created and whether the creation of such a trust removes or excludes certain property from the bankruptcy estate.

Turning to the Agreement and the express trust issue, no provision of the Agreement creates an express trust relationship between the Debtor and the Agent. Rather, the Debtor receives a gross commission from the sale of real property, of which a portion or percentage is payable to the Debtor, and a separate percentage is payable to the Agent. On that gross commission, the Debtor must calculate any franchise, errors and omissions, or other fees due and owing to it. Hence, the Agreement contemplates that the gross

commissions be considered assets of the Debtor from which certain disbursements are to be made. The Agents argue that since the Debtor must promptly turn over the net commissions to the Agent, a trust relationship is somehow created or the net commissions are carved out from property of the estate. However, 11 U.S.C. § 541(c)(1) provides that even if an agreement restricts or conditions the transfer of the debtor's interest in certain property, the interest still becomes property of the bankruptcy estate.[19] The prompt turnover of the commissions is not a restriction on the transfer of the Debtor's interest in the property. However, even if it were a restriction, 11 U.S.C. § 541(c)(1) states that the entire commission still becomes property of the Debtor's estate.

Furthermore, the designated broker's January 9, 1996 affidavit confirms that the commissions were held in a general corporate account and were never treated as trust funds, thereby vitiating the Agents' argument that some kind of oral express trust was created because of the custom or practice of the Debtor. Once the funds were placed in the Debtor's general corporate account, the Debtor then paid the Agents.

As to the nature of the relationship between the Debtor and the Agents, the Trustee and the Bank correctly analyzed it as being a "debtor/creditor" relationship. The Bankruptcy Code defines a "creditor" as an:

---

able under applicable nonbankruptcy law is enforceable in a case under this title.
11 U.S.C. § 541(c)(2) (1996).

**17.** 11 U.S.C. § 541(d) states:
(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage, secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
11 U.S.C. § 541(d) (1996).

**18.** *See* discussion *infra* concerning resulting and constructive trusts.

**19.** 11 U.S.C. § 541(c)(1) states:

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
(A) that restricts or conditions transfer of such interest by the debtor; or
(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.
11 U.S.C. § 541(c)(1) (1996).

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

(B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or

(C) entity that has a community claim.[20]

In many cases, creditors providing services or goods to a debtor are doing so pursuant to an independent contractor agreement. Therefore, to exclude independent contractors from the definition of "creditor" would exclude many creditors from recovering from an estate. Moreover, the definition of "creditor" does not have such exclusionary language.

Next, a creditor is an individual or entity which has a "claim" against the debtor. The Bankruptcy Code defines "claim" as a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured, or unsecured.[21]

The Agents have performed all services which warrant the payment of a commission and the escrows have closed, indicating that the title companies are actually holding the funds from the closing of the real estate transactions necessary to pay the Debtor and the Agents. Therefore, the Agents have a "right to payment" that is "liquidated" or a claim against the Debtor for payment of their commissions.

Although from the Fifth Circuit, the decision of *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Management, Inc.)*, 4 F.3d 1329 (5th Cir.1993), is similar to the facts herein and describes the nature of a real estate agent's legal relationship with the debtor as being one of creditor/debtor. In *Oxford Management*, the debtor provided commercial leasing services. As such, it entered into independent contractor agreements with individuals to provide such services. The debtor agreed that one individual would serve as a leasing specialist for a project in New Orleans owned by Fidinam U.S.A., Inc. ("Fidinam").[22] The debtor and Fidinam entered into an agreement which provided that Fidinam would pay the debtor six percent of the rental value. The debtor placed the funds in its general operating account. In turn, the debtor had a separate agreement with the individual that from the 6 percent received, the debtor would pay the individual 4 percent of the monthly rental from leases generated by the individual for the Fidinam project. The remaining 2 percent of the commission was retained by the debtor.[23] The debtor instituted the practice of receiving the commissions and then paying the individual because applicable state law required that associate brokers only receive commissions from sponsoring brokers.[24]

The *Oxford Management* court considered whether the commissions received became a part of the bankruptcy estate. The court noted that applicable state law should be reviewed to determine the interests of the parties in the commissions.[25] The court stated that the individuals did not have contracts with Fidinam, only the debtor. Although the debtor had entered into separate agreements with the individuals and had an obligation to pay the individuals their commissions, the separate and distinct contracts between Fidinam and the debtor and the debtor and the individuals created a debtor/creditor relationship as to the individuals.[26] Although the individuals argued that a trust relationship had been established because of the debtor's duty to receive commissions on behalf of the

**20.** 11 U.S.C. § 101(10)(A)–(C) (1996).

**21.** 11 U.S.C. § 101(5)(A) & (B) (1996).

**22.** *Oxford Management,* 4 F.3d at 1332.

**23.** Id.

**24.** *Id.* at 1332, 1333 & n. 3.

**25.** Id. at 1334.

**26.** Id. at 1334–35.

individuals and to pay over the commissions or suffer civil penalties for a failure to act, the court stated that all commissions received were placed in a general corporate deposit account. As such, no trust relationship existed. The agreement between the debtor and the individuals also did not prohibit the debtor from utilizing the funds for other purposes.[27]

In this case, the Agents did not enter into any agreement with the title companies or with the sellers or purchasers to the real estate transactions which closed. The Debtor exclusively owned all of the listings or contracts concerning the real estate transactions. The Debtor calculated its franchise, errors and omissions, and other fees from the gross commissions earned. Only the Debtor contracted with the title companies concerning the payment of commissions.[28] The title companies previously paid the Debtor, which in turn turned over the net commissions to the individual Agents. The Agreements directed that the commissions be turned over promptly to the Agents, but they did not prohibit the commingling of the commissions with other operating funds of the Debtor. Moreover, the Agreements did not expressly prohibit the Debtor's use of the money for other purposes. As such, only a debtor/creditor relationship was created and the commissions became property of the Debtor's estate.

Courts in other jurisdictions which have reviewed the issue of real estate commissions have consistently held that the commissions become property of the estate and that a debtor/creditor relationship is created. *Harrington v. Johnson (In re Taylor & Campaigne, Inc.),* 157 B.R. 493, 495 (M.D.Fla. 1993); *Halloway v. Hyman (In re Bob Hamilton Real Estate, Inc.),* 138 B.R. 301, 302 (Bankr.M.D.Fla.1992), *aff'd sub nom., Arvay v. Hyman,* 187 B.R. 743 (M.D.Fla.1995). Although the Agents attempt to distinguish these Florida cases from the facts herein on the basis that, in *Taylor & Campaigne* and *Bob Hamilton,* certain real estate transactions did not close until after the bankruptcy petition was filed, the Florida courts nevertheless held that the commissions were earned by the sales agents prepetition, the commissions became property of the estate, and the sales agents had only unsecured claims against the debtors.[29] Therefore, the fact that the commissions were received postpetition by the debtors in the Florida cases was irrelevant to the decision of the district and bankruptcy courts.[30]

This Court must next consider whether a trust relationship should be imposed as an equitable remedy or has been created by operation of law to effectuate the intent of the parties. The Agents argue that a constructive trust should be imposed as an equitable remedy on the funds held by the title companies and, as such, the Agents, commissions never became property of the bankruptcy estate. A Ninth Circuit decision has considered the constructive trust issue and applied Arizona law in arriving at its conclusion. As such, the Court will start its analysis with a discussion of *Torres v. Eastlick (In*

27. *Id.* at 1335.

28. If the Agents had separate contracts with the title companies or with the sellers or purchasers to the real estate transactions, they certainly presented no evidence of them.

29. *Taylor & Campaigne,* 157 B.R. at 495; *Bob Hamilton,* 138 B.R. at 302.

30. The Trustee and the Bank also rely on *Batt v. Scully,* 168 B.R. 541 (D.N.J.1994), to support their position that the Agents are not entitled to carve out the commissions from the bankruptcy estate. The *Batt* decision, however, focuses on different theories than those advanced in this case, and New Jersey law is substantially different from the law of Arizona. First, the sales agents in *Batt* advanced the theory of a derivative equitable lien; that is, the agents should be entitled to benefit from a lien that may be created under New Jersey law between a broker and the seller and the seller's property or the fund created by the efforts of the broker. In *Batt,* the court held that if such an equitable lien existed in favor of the agents, it ceased to exist once the broker filed a bankruptcy petition. *Batt v. Scully,* 168 B.R. at 550. The Agents have not advanced such a theory in this case and Arizona law does not provide for such an equitable lien. Second, New Jersey law provides that a broker (and hence an agent) does not earn a commission until the closing has occurred. *Id.* at 547 n. 10. In Arizona, the broker and the agent earn a commission at the time they produce a ready, willing and able buyer. *Manning v. Blackwelder,* 146 Ariz. 411, 412, 706 P.2d 737, 738 (Ct.App.1985) (citing *Arthen v. Chilleen,* 103 Ariz. 133, 437 P.2d 925 (1968)).

*re North Am. Coin & Currency, Ltd.),* 767 F.2d 1573 (9th Cir.1985), *amended by* 774 F.2d 1390 (9th Cir.1985), in which the debtor established a bank account labeled a "Special Trust Account" at a time when the debtor was experiencing financial problems.[31] The debtor placed all receipts from new transactions with customers into the Account.[32] The debtor never intended that the funds in the Account be used as operating funds of the debtor.[33] During a one–week period in 1982, various individuals, as new customers of the debtor, placed nearly $600,000 in orders with the debtor, and the money to carry out the transactions was placed in the Account. The customers never received the commodities that they purchased, and the funds still remained in the Account at the time the Ninth Circuit rendered its decision.[34]

Applying Arizona law in *North American Coin,* the Ninth Circuit held that even funds subject to a constructive trust still became property of the estate. Because a state court had not entered a decree or order *prepetition* designating the funds in constructive trust for certain customers, the *North American Coin* court stated:

> We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws.[35]

Although the Ninth Circuit held that a bankruptcy estate would not have an interest in property acquired by fraud by a debtor as against the rightful owners of the property, the court concluded that, based upon the evidence, the debtor acted in good faith and had not intended to defraud the customers.[36]

The Ninth Circuit also addressed whether the funds should be turned over to the customers although no fraud had been shown because the customers' funds were allegedly obtained by a "means which [rendered] it unconscionable for the holder of legal title to retain and enjoy its beneficial interest."[37] The *North American Coin* court refused to exercise its equitable powers, stating:

> For reasons of federal bankruptcy policy to which we have already referred, we are reluctant so to exercise a general equitable power in the circumstances here presented. We fully recognize that plaintiffs have sustained substantial losses as a result of the [debtor's] bankruptcy. Plaintiffs, however, comprise only one of several comparable groups of creditors who sustained substantial losses. Plaintiffs happened to place their orders during the week of September 13, with the result that their funds were placed in a "trust" account (even though it was contemplated that the funds might later be removed to complete the transactions). Another group of customers placed their orders shortly before September 13, but sent in their purchase money during the week of September 13. Their funds were not placed in a special account, and they must look to the bankruptcy proceeding for their relief. Other customers both placed their orders and sent in their funds prior to September 13, but their orders had not been executed at the time of the bankruptcy. They, too, are treated as general creditors in the bankruptcy. We fail to discern the equitable principle that requires us to protect the [customers'] investments fully, at the expense of these other creditors.[38]

This Court must next consider the decision of *Mitsui Manufacturers Bank v. Unicom Computer Corp. (In re Unicom Computer Corp.),* 13 F.3d 321 (9th Cir.1994), to determine whether it distinguishes or effectively overrules the decision of *North American Coin.*[39] In *Unicom,* the debtor served as a

---

**31.** *North Am. Coin,* 767 F.2d at 1574–75.

**32.** *Id.* at 1575.

**33.** *Id.*

**34.** Id.

**35.** Id. at 1575.

**36.** *Id.* at 1576–77.

**37.** Id. at 1577.

**38.** Id. at 1577–78.

**39.** *Unicom* was decided according to California law. For a further discussion of constructive trusts under California law, see *Taylor Associates*

broker of computer equipment, arranging a lease between Mitsui Manufacturers Bank ("Mitsui"), as lessor, and Pitney Bowes, Inc. ("Pitney"), as lessee. Because Mitsui had needed to finance the purchase of the equipment as a predicate to leasing the equipment to Pitney, Pitney actually remitted its lease payment to Mitsui's secured creditor that financed the transaction, which then paid Mitsui the difference between the monthly rental payment and the monthly loan obligation.[40]

Before the expiration of the lease, Pitney requested that the debtor locate a party willing to assume Pitney's obligations under the lease agreement. The debtor was only able to obtain Cincinnati Milacron ("Cinci") as a potential lessee, but at a substantially reduced rental and for less than the duration of the original lease. The debtor structured a sublease agreement which provided that Pitney would sublet the equipment to the debtor, which in turn would sub-sublet the equipment to Cinci. The debtor received a monthly broker's commission on the sub-sublease agreement. The balance of the funds on the sub-sublease agreement were turned over by the debtor to Mitsui's secured creditor and Pitney remained liable to Mitsui for the difference on a monthly basis between the rental on the original lease agreement and the net rental on the sub-sublease agreement. Therefore, although the debtor "billed" Pitney on a monthly basis advising Pitney of its ongoing obligations to pay the difference between the original lease agreement and the sub-sublease agreement to Mitsui's secured creditor, the debtor's invoice was for informational purposes only.[41]

Prior to filing its bankruptcy petition, the debtor apparently encountered organizational and/or accounting problems and made a number of errors. First, the debtor neglected to send to Pitney the final two informational invoices in a timely manner. Second, because Mitsui's secured creditor had been paid in full, the debtor was supposed to advise Pitney to pay the final two installments on the original lease directly to Mitsui. Instead, the debtor improperly directed that the payments be made to it. Finally, the debtor did not forward the Pitney check to Mitsui, but placed the funds in the debtor's general account.[42] The Ninth Circuit questioned whether such actions could have resulted only from excusable neglect.[43] The *Unicom* court also concluded that to the extent necessary, Mitsui was able to trace the funds that belonged to it and which were held by the debtor.[44]

The *Unicom* court started its analysis with the general proposition that trust property is not property of the estate pursuant to 11 U.S.C. § 541(d).[45] From that principle, the *Unicom* court concluded that trusts created prepetition *by operation of state law* were also not property of the estate. Next, the Ninth Circuit distinguished its holding in *Unicom* from that in *North American Coin*, stating that under Arizona law, a constructive trust arose only in those situations "involving active misconduct on the part of the debtor amounting to fraud and [that] position was not inconsistent with federal bankruptcy law."[46] Under California law, the *Unicom* court stated that "simple negligence" of a debtor could cause the imposition of a constructive trust when a debtor "wrongfully detain[ed] another's property."[47] In *North American Coin*, there was no evidence of any wrongdoing, since the debtor, as part of its ordinary business operations, accepted money from individuals purchasing precious met-

*v. Diamant (In re Advent Management Corp.),* 178 B.R. 480, 488–89 (9th Cir. BAP 1995).

**40.** *Unicom,* 13 F.3d at 322.

**41.** Id. at 322, 323 & 323 n. 1.

**42.** *Id.* at 323.

**43.** Id. at 323 n. 3.

**44.** *Id.* at 325 n. 5.

**45.** The Ninth Circuit relied upon *Begier v. Internal Revenue Service,* 496 U.S. 53, 58–59, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990), and *Sierra Steel Inc. v. S & S Steel Fabrication (In re Sierra Steel Inc.),* 96 B.R. 271, 273 (9th Cir. BAP 1989).

**46.** *Unicom,* 13 F.3d at 325.

**47.** Id.

als.[48] There was no further reason to explore modification of federal bankruptcy law principles to pay certain investors. In *Unicom,* the court emphasized that the debtor had wrongfully detained Pitney's misdirected check and had made numerous mistakes resulting in funds properly belonging to Mitsui being placed in the debtor's account. Once Mitsui established the grounds for the imposition of a constructive trust, it then became the debtor's burden to prove that it would be inequitable to impose a constructive trust over the funds.[49]

In reviewing the facts and the law in this matter, this Court concludes that it must follow the *North American Coin* decision. First, although 11 U.S.C. § 541 describes what constitutes property of the estate, Arizona law must be considered to determine whether a constructive trust was created prepetition. This Debtor has not engaged in any active prepetition misconduct to warrant the imposition of a constructive trust.

Second, this Court must consider the decision of *Golden Mortgage Fund #14 v. Kennedy (In re Golden Triangle Capital, Inc.),* 171 B.R. 79 (9th Cir. BAP 1994), which reanalyzed the *Unicom* decision on a resulting trust—rather than a constructive trust—theory, since the parties in *Unicom* never intended that the debtor should obtain the Mitsui payments.[50] This Court agrees that although the *Unicom* decision only discusses constructive trust theories, the *Unicom* decision may be more easily interpreted and distinguished from that of *North American Coin* based upon the difference in the intention of the parties.[51]

Third, another decision of the Ninth Circuit Bankruptcy Appellate Panel, *Airwork Corp. v. Markair Express, Inc. (In re Markair),* 172 B.R. 638 (9th Cir. BAP 1994), emphasizes the importance of when the constructive trust remedy is imposed in deter-

mining whether the property is excluded from the bankruptcy estate. In *Markair,* one of the debtor's aircraft was involved in a collision while on the ground, resulting in damage to an engine. The debtor requested that Airwork repair the engine, and the debtor reported the loss to its insurance company. The engine was repaired, installed by a third party on another of the debtor's aircraft, and Airwork billed the debtor for the repair work and other services. The debtor then filed its bankruptcy petition. The insurance company held the proceeds in escrow pending a determination by the bankruptcy court concerning the payment of the funds.[52] Airwork argued that a constructive trust should be imposed on the proceeds in its favor because it would be inequitable for the debtor to retain the engine and the insurance proceeds.[53] The *Markair* Panel stated that if the constructive trust remedy were imposed prepetition pursuant to applicable state law, the property in trust would be excluded form the bankruptcy estate. However, if the remedy was "inchoate" prepetition, the party seeking to impose the remedy would be "subordinate to the trustee's strong arm power."[54] Since no prepetition constructive trust was created, the Panel determined that Airwork should share, as any other creditor, in the bankruptcy estate assets.

In the present case, as in *Markair,* the Agents did not have a constructive trust imposed prepetition as to the Commissions. Moreover, there would be no basis under Arizona law to impose such a trust in light of the "active misconduct" requirement of *Unicom* and *North American Coin.*

The Agents also apparently attempt to distinguish *North American Coin* by relying on certain Arizona statutory provisions regulating real estate brokers. Although the Court

---

48. *Id.*

49. Id.

50. *Golden Triangle,* 171 B.R. at 82.

51. A more thorough discussion of the differences between a resulting versus a constructive trust are discussed *infra.*

52. *Markair,* 172 B.R. at 640.

53. *Id.* at 642.

54. Id.

will address these statutory provisions, they were in effect, albeit in a modified form in 1986, at the time of the *North American Coin* decision. The Court assumes that the Ninth Circuit was aware of these statutes at the time of its decision. Moreover, the statutory provisions do not support the Agents' argument.

■ Initially, the Agents rely upon Section 32–2151(A) of the Arizona Revised Statutes for the proposition that a prepetition trust was created as to the Agents. Section 32–2151(A) provides:

Unless otherwise provided in writing by all parties to a transaction, any licensed real estate broker who does not immediately place all funds entrusted to him, in his capacity as a real estate broker, in a neutral escrow depository in this state shall upon receipt place all such funds in a trust fund account in a federally insured or guaranteed account in a depository located in this state. . . . [55]

Therefore, the Debtor could choose, with its designated broker, to place all funds received from a seller or buyer to a real estate transaction in a trust fund *or* the funds could be placed with a neutral depository such as a title company. The Debtor and the designated broker utilized title companies. The Debtor maintained a general account into which it placed the gross commissions received after the closing of a real estate transaction. As such, the facts in this case do not support the creation of any trust fund to hold the Agents' commissions. The Trustee and the Bank have also correctly noted that the purpose of Section 32–2151 of the Arizona Revised Statutes was to protect the funds placed by a *seller* and a *buyer* with a designated broker in the event that a closing of the real estate transaction did not occur. The licensing and regulation of real estate

brokers is to protect the public.[56] The statute was not enacted to protect the commissions of real estate brokers or sales agents.

Interestingly enough, whether the designated broker maintained a trust fund at the request of the Debtor, or had the title companies hold the funds, Arizona law required that the Agents only be paid from the Debtor. Section 32–2155(A) of the Arizona Revised Statutes provides:

A broker shall employ and pay only active licensees, and a licensee shall accept employment and compensation as such only from the legally licensed broker to whom the licensee is licensed or from the licensed professional corporation of which the licensee is an officer and shareholder.[57]

In this case, the title companies routinely turned over the funds from the real estate closings to the Debtor, which had a designated broker disburse the net commissions to the Agents. Pursuant to Section 32–2155 of the Arizona Revised Statutes, the title companies did not have the authority to pay the funds directly to the Agents. Therefore, the Agents have not made, and cannot make, a showing that there was some sort of a separate agreement between the designated broker and the title companies to pay the Agents upon the closing of the various escrows.[58]

■ Although not specifically briefed by the parties, the Agents' arguments are broad–based, emphasizing that under some theory of trust law, the commissions should be excluded as property of the estate. Therefore, the Court will discuss whether the commissions may be excluded on the theory that a resulting trust—as opposed to a constructive trust—was created prepetition.

As noted previously, this Court should review Arizona law on the issue. Arizona courts have frequently cited to the *Restate-*

---

55.  Ariz.Rev.Stat. Ann. § 32–2151(A) (West 1995).

56.  *Sigmen v. Arizona Dept. of Real Estate,* 169 Ariz. 383, 388, 819 P.2d 969, 974 (Ct.App.1991) (citations omitted).

57.  Ariz.Rev.Stat. Ann. § 32–2155 (West 1995).

58.  The Court, in the statement of facts, has previously questioned the initial effect of the letter from the designated broker to a title company in

December 1994, attempting to have the title company pay several Agents directly. In any event, Debtor's counsel subsequently forwarded a letter to the title companies nullifying the broker's letter or letters. Pursuant to Section 32–2155 of the Arizona Revised Statutes, the broker did not have the authority to send such a letter.

*ment (Second) of Trusts* in determining whether a resulting trust has arisen.[59]

■ Section 404 of the *Restatement (Second) of Trusts,* provides:

A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of.[60]

■ In some cases, the transferor may wish to make a gift of the property to the transferee or the transferor may loan the purchase price to the transferee. A resulting trust does not arise under such circumstances.[61] It is also true that if *both parties* intend that the beneficial interest in certain property shall vest in the transferee, no resulting trust is created.[62]

■ Although not determined under Arizona law, a 1994 decision of the Ninth Circuit Bankruptcy Appellate Panel discussed the differences between a constructive and a resulting trust. In the decision of *Golden Triangle Capital,* the Panel stated that a resulting trust arose out of the intended ownership rights in property, whereas a constructive trust was a remedy to correct a wrong.[63] Therefore, the distinction between the two trust concepts could be critical. The *Golden Triangle* Panel stated:

A resulting trust is a trust implied by operation of law to enforce the inferred intent of the parties to establish a trust. A

transaction that has failed to carry out the parties' intent becomes a resulting trust, and a resulting trust cannot be part of the debtor's estate. A constructive trust, on the other hand, is a remedy for circumstances where, although both legal and equitable title repose in one party, in equity the beneficial interest should belong to another. In the event that circumstances warrant the remedy of a constructive trust, however, this equitable remedy must be weighed against bankruptcy's equitable policy of ratable distribution, to which end the point in time when the remedy is imposed may become critical. Pursuant to Unicom, the debtor has the burden to demonstrate that ratable distribution outweighs the creditor's equitable remedy.[64]

The Golden Triangle Panel then reexamined the Ninth Circuit law and determined that—although Unicom discussed constructive trust theories—the *Unicom* decision should be considered under a "resulting trust" analysis, since the legal relationship between the parties never intended that the debtor should have an interest in the property.[65] The *Golden Triangle* Panel also concluded that other Ninth Circuit decisions only focused on a claim by a creditor and the creation of a constructive trust as a remedy. If a constructive trust were at issue, the claimant might be treated as a creditor and be subject to the policy of ratable distribution.[66]

The Ninth Circuit Bankruptcy Appellate Panel addressed the issue of resulting trusts again in the decision of *Markair.*[67] The *Markair* Panel restated its position, as initially outlined in *Golden Triangle,* concerning

**59.** *E.g., Gabitzsch v. Cole,* 95 Ariz. 15, 20, 386 P.2d 23, 26 (1963); *Collins v. Collins,* 46 Ariz. 485, 497, 52 P.2d 1169, 1174 (1935); *Valley Nat'l Bank v. Hay,* 13 Ariz.App. 39, 42, 474 P.2d 46, 49 *reh'g denied,* 13 Ariz.App. 180, 475 P.2d 9 (1970).

**60.** Restatement (Second) of Trusts § 404 (1995).

**61.** *See Wheel of Life Found., Inc. v. Ladwig,* 15 Ariz.App. 523, 526–27, 489 P.2d 1225, 1228–29 (1971). *See also Pool v. Peil,* 22 Ariz.App. 417, 528 P.2d 168 (1974) (purchase money resulting trust arose when down payment and all other payments concerning the purchase of the home were made by the Peils, although title to the

residence at the time of the purchase was placed in the Pools' name).

**62.** See *Washburn & Roberts, Inc. v. Park East (In re Washburn & Roberts, Inc.),* 795 F.2d 870, 873 (9th Cir.1986) (applying Washington law).

**63.** *Golden Triangle,* 171 B.R. at 82.

**64.** Id.

**65.** Id.

**66.** *Id.*

**67.** Markair, 172 B.R. at 641–42.

the distinction between a resulting and a constructive trust, stating that: [68]

> Rather than being a determination of rights arising by law because of mistake or omission as is a resulting trust, a constructive trust is an equitable remedy. Unlike a resulting trust, "[a] constructive trust is not grounded in the intention of the parties, inferred or presumed; it is a remedial device of equity—a trust in invitum—to prevent unjust enrichment." [69]

The *Markair* court concluded that Airwork had failed to show that the parties intended to create a resulting trust.

Turning to the issues in this case, the *Restatement (Second) of Trusts* requires that the person making the disposition or transfer of property intends that he or she retain some beneficial interest in the property. For instance, in *Pool v. Peil,* 22 Ariz.App. 417, 528 P.2d 168 (1974), the Peils made the down payment and all subsequent payments concerning the purchase of the house, yet the real property was titled in the name of the Pools. The Peils paid the consideration for the home, intending to retain an interest in it. Therefore, a resulting trust was proper.

Here the Agents did not transfer property or pay any consideration *to the Debtor,* intending to retain a beneficial interest. The Agents simply turned over property or consideration paid by the purchasers of real property. The Debtor and the Agents established a debtor/creditor relationship, and the Agents had only a claim to any funds created upon the close of the escrow. Such a relationship negates the imposition of any resulting trust. Moreover, because the Debtor was only required to pay over the net commissions to the Agents as soon as possible, the commissions could be placed by the Debtor in its general operating account and utilized for a variety of business purposes. The fortuitous circumstances that the commissions were held by the title companies in various escrows at the time the Debtor filed its bankruptcy petition does not change the intent of the parties and the nature of the legal relationship created between them.

The Court concludes that no resulting trust was created in favor of the Agents.

B.   Whether a prepetition bailment existed between the Agents and the Debtor or the title companies and, if so, whether any such property became property of the bankruptcy estate.

[10]   The Agents rely principally upon *Markel v. Transamerica Title Insurance Co.,* 103 Ariz. 353, 442 P.2d 97 (1968), for the proposition that a bailment was created prepetition. The Agents further argue that any property that is part of a bailment never becomes property of the bankruptcy estate. In Markel, the plaintiff obtained a divorce from Earl E. Van-Y in 1939. As a part of a property settlement agreement, Mr. Van-Y was to pay Ms. Markel one-half of the proceeds received from the sale of certain Arizona property. Mr. Van-Y transferred the property to a number of parties and another wife, Virginia Van-Y, ultimately obtained the property. In 1957, Ms. Van-Y sold the property. Transamerica Title and Trust Company (f/k/a Phoenix Title and Trust Co.) became the escrowee and the trustee of the subdivision trust created at the time of sale. Ms. Markel learned of the sale and the subdivision trust and requested that Transamerica Title hold any funds received by it and any funds to be received by it in trust for Ms. Markel, and that Ms. Markel should ultimately receive any and all distributions from the subdivision trust. Although Ms. Markel initially obtained an injunction prohibiting Transamerica Title from distributing any funds to Ms. Van-Y, the injunction was set aside. Transamerica Title then made distributions to Ms. Van-Y from the subdivision trust. Ms. Markel did not advance a constructive trust theory in her second amended complaint, but she specifically alleged fraudulent conduct or "active misconduct" by Ms. Van-Y.[70] The *Markel* court held that, although Transamerica Title had not participated in the fraud, once it received notice of Ms. Markel's action against Ms. Van-Y, Transamerica Title held any funds in the subdivision trust as a constructive trustee

---

68.   *Id.*

69.   Id. at 642 (citation omitted).

70.   *Markel,* 103 Ariz. at 356, 442 P.2d 97.

and must hold the funds until the final disposition of Ms. Markel's action.[71] Therefore, the *Markel* decision focuses on *active misconduct* by Ms. Van-Y and the responsibility of a title company to hold the funds until an action based on fraudulent conduct is resolved. As noted previously, such fraudulent conduct and constructive trust theories are not applicable to the matter before this Court.

The *Markel* court, in *dicta*, attempts to justify its decision based upon the law of bailment. Initially, the *Markel* court notes that Transamerica had both title and possession—presumably of any proceeds resulting from a sale of the property. In a bailment, the bailee has only possession, not title, of the property. The *Markel* court then states that a trustee and a bailee are in a similar position in that if there is interference with possession by a trustee or a bailee, there is still the wrong of conversion.[72] However, this brief comparison between a trustee and a bailee has nothing to do with the facts before this Court.[73]

Moreover, the law of bailment generally deals with goods or personal property, not funds on deposit with title companies. *Black's Law Dictionary* defines a "bailment" as:

> A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust.[74]

The definition requires that the bailor deliver the "goods" or "personal property" to the bailee pursuant to certain terms or conditions and then redeliver the property to the bailor or to a party designated by the bailor. Even if, pursuant to *Markel*, the concept of a bailment may be extended to moneys, in the matter before this Court, the *purhaser* of real property delivered the purchase price to the title company, of which a portion of the funds included the gross commission payable to the Debtor. The purchaser never asked for redelivery of the funds either before or after the escrow closed, and the gross commissions received were only to be turned over to the Debtor.

This Court sees no basis, as a matter of fact and law, that a bailment was created as to the commissions held by the title companies.

C. Whether the fact that the commissions were "earned" prepetition removes the commissions as property of the Debtor's estate.

The Agents attempt to distinguish *Bob Hamilton* and the other cases concerning the payment of commissions on the basis that the Agents in this case earned their commissions prepetition and that said fact alone carves the commissions out of bankruptcy estate property.

First, the Agents, the Trustee and the Bank incorrectly stipulated, apparently as a matter of fact, that the commissions were "earned" upon the closing of the real

---

71. Id. at 359, 442 P.2d 97.

72. *Id.* at 360, 442 P.2d 97.

73. The Arizona Supreme Court has since stated that the holding in *Markel* transgresses the outer limits of the constructive trust remedy. *See Burch & Cracchiolo, P.A. v. Pugliani,* 144 Ariz. 281, 283, 286, 697 P.2d 674, 675, 679 (1985). First, in *Markel,* Transamerica Title had disbursed all funds in the subdivision trust long before the Court imposed the constructive trust remedy. Therefore, the Plaintiff, Markel, only had a claim for money damages at the time of the decision. The *Burch & Cracchiolo* court concluded that a constructive trust does not arise under such circumstances. *Burch & Cracchiolo,* 144 Ariz. at 285, 697 P.2d at 678. Next, in *Markel,* Transamerica Title was only acting in accord with the subdivision trust agreement and only received proceeds from the purchaser of the property. Transamerica Title was never unjustly enriched as a result of performing pursuant to the subdivision trust and the constructive trust was never imposed based upon the requirement of restitution which is usually necessary before a constructive trust is imposed. *Id.* at 286–87, 697 P.2d at 679–80.

74. *Black's Law Dictionary* 73 (5th ed.1983). For the definition of "goods," see 353–54, and for "personal property," see 636.

estate transaction. Arizona law has consistently held that a real estate commission is earned by an agent at the time the agent produces a willing buyer to a willing seller; that is, upon the execution of a real estate contract concerning the sale of certain real property.[75] In the *Bob Hamilton* and *Taylor & Campaigne* decisions, the commissions were also earned prepetition. Nevertheless, the courts concluded that the commissions became property of the bankruptcy estate. The fact that the commissions were actually paid postpetition in the *Bob Hamilton* and *Taylor & Campaigne* decisions is not factually dissimilar from the commissions being held by the title companies in this case and about to be paid to the Debtor. The point of the nature of the legal relationship in this and the other cases is debtor/creditor. Therefore, the commissions are subject to the claims of all creditors, such as the Agents.

A similar analysis may be drawn as to employee wage claims. If the employee renders services prepetition and the services remain unpaid at the time of the filing, the employee has "earned" his compensation. Nevertheless, the employee only has a claim against the bankruptcy estate for the payment of earned compensation. Even if the employee renders services pursuant to a union contract and that contract is assumed postpetition, the assumption of the union contract does not elevate the employee's unsecured priority wage claim to a postpetition administrative expense.[76]

### V. *Conclusion*

In conclusion, this Court sees no reason to elevate the claim of the Agents to anything other than it is; namely, an unsecured prepetition claim. The Agents' request for summary judgment is denied; the Trustee's and Bank's cross motion for summary judgment is granted. The Court will issue a separate order which is consistent with this Memorandum Decision.

---

**75.** *See Manning v. Blackwelder,* 146 Ariz. at 412, 706 P.2d at 738.

**76.** *See In re Schatz Federal Bearings Co.,* 5 B.R. 549, 553–56 (Bankr.S.D.N.Y.1980).