In re MICROAGE CORPORATION, a Delaware corporation, et al., Debtors.

MicroAge, Inc., et al., Plaintiffs,

v.

Mitsubishi Electric and Electronics USA, Inc., et al., Defendants.

Bankruptcy Nos. BR–00–03833–ECF–CGC, BR–00–03834–ECF–CGC. Adversary No. 02–311–CGC.

United States Bankruptcy Court, D. Arizona.

Feb. 3, 2003.

Donald L. Gaffney, Steven D. Jerome, Joe T. Stroud, Snell & Wilmer, LLP, Phoenix, AZ, for Plaintiffs/Debtors.

Charles M. Stern, Daniel M. Pelliccioni, Katten Muchin Zavis Rosenman, Los Angeles, CA, for Mitsubishi Electric and Electronics USA, Inc.

## UNDER ADVISEMENT DECISION RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

CHARLES G. CASE, II, Bankruptcy Judge.

### I. Introduction

Defendant Mitsubishi Electric and Electronics USA, Inc. ("Defendant") seeks partial summary judgment on Debtors', MicroAge, Inc. *et al.*, section 547(b) preference claim and section 553(b)(1) offset claim with respect to Debtors' use of various credits to reduce their obligations to Defendant. Defendant argues that the credits do not satisfy several of the elements of a section 547(b) preference, including the requirement that the credits constitute an "interest of the debtor in property," that Defendant qualifies as a transferee, that the transfer of the credit benefitted Defendant, and that Defendant receive more by virtue of the transfer than it would have received in a Chapter 7 case. In addition, Defendant argues that the credits do not satisfy the elements of section 553(b)(1) such that they can be considered setoffs. The Court agrees.

### II. Facts

Commencing in 1995, Defendant sold computer monitors to Debtors pursuant to a Mitsubishi Electronics Brand Name Distributor/Reseller Purchase Agreement. Defendant would invoice Debtors for monitors sold. Throughout their relationship, Defendant would issue what it called "credit memos" to Debtors, which allowed Debtors to reduce the invoices by certain amounts based on a portion of Debtors' qualifying advertising expenditures. This apparently was meant to encourage Debtors to take advantage of certain programs, such Defendant's "co-op" advertising program. Debtors normally paid their invoices by check after subtracting the allowed credit memo amounts. According to

Defendant, the credit memos were issued only to Defendant's customers, such as Debtors, and were non-transferable. Further, they could be used only as credits against Defendant's invoices and could not be redeemed for cash.

In April, 2002, Debtors filed their Complaint to Avoid and Recover Preferential Transfers and Preferential Setoffs against Defendant. According to Debtors, Defendant received eight checks totaling $828,603.21 and $262,856 in redeemed credits from Debtors within the preference period. The redeemed credits are noted on each of the eight checks delivered to Defendant during the preference period. In addition, Debtors allege that Defendant has issued an additional $1,335,904 in credits that Debtors have yet to redeem. There appears to be no dispute as to the accuracy of these figures.[1] The dispute centers on whether these credits constitute property of the estate that can be transferred within the meaning of the 11 U.S.C. section 547(b) and whether they can be considered setoffs for purposes of 11 U.S.C. section 553(b)(1). For the following reasons, the Court finds that summary judgment with respect to these credits is appropriate for Defendant.

### III. Analysis

#### A. Ambiguity of provisions in the distribution agreements

As a preliminary matter, the Court rejects Debtors' argument that various provisions of the distribution agreements between Debtors and Defendant are ambiguous or contradictory, thereby creating genuine issues of material fact precluding summary judgment at this time and requiring an extension of time to complete discovery. Debtors point to the language of section 2 of the Distributor Cooperative Advertising Agreement ("Exhibit G"), which provides

If an advertising claim is submitted in accordance with the procedures set forth in this Plan and is properly supported, Buyer will be issued a credit toward its future MELA brand name peripheral product purchases, or if Buyer is no longer, at the time such credit arises, an Authorized Buyer of MELA brand name peripheral products, such Buyer will be reimbursed therefore in cash if Buyer is not then indebted to MELA, has no undelivered orders at such time, and the qualified advertising occurred while the Buyer was still an Authorized Buyer of MELA brand name peripheral products. ADVERTISING AND PROMOTION CLAIMS ARE NOT TO BE DEDUCTED FROM INVOICES.

Debtors also point to language in Article VII of the Mitsubishi Electronics Brand Name Distributor/Reseller Purchase Agreement, which states that all invoices must be paid in cash and "[b]uyer shall have no right to take any deductions from or make any off-sets against any [Mitsubishi] invoice, even for credits or other amounts owing to Buyer from [Mitsubishi], without [Mitsubishi's] prior written approval." Debtor interprets these provision to prohibit the payment of invoices using these credits, at least without Defendant's written approval. Further, according to Debtors, the credits do in fact have considerable value as they can be redeemed for cash. Therefore, Debtors claim that the language of the agreements themselves create a genuine issue of material fact as to whether the use of the credits consti-

---

1. Debtors initially alleged that Defendant received $333,948.31 in the form of redeemed credits. In their opposition to Defendant's motion for partial summary judgment, however-

er, they acknowledged that further review of their records revealed that Defendant only received $262,856 in redeemed credits during the preference period.

tutes a transfer of an interest of the debtor in property and further discovery is necessary to obtain copies of all other relevant agreements between the parties to determine how each type of credit is treated under the agreements.

The Court disagrees. A reading of the distributor agreement *in toto* finds no ambiguity or contradiction of its terms, either among themselves or with Defendant's arguments in its pleadings. Exhibit G, quoted above, does not stand for the general proposition that these credits can be redeemed for cash at any time and in any situation and, therefore, have traditional "value" for purposes of section 547(b). This interpretation is, at best, disingenuous. Section 2 of Exhibit G clearly explains to a buyer, like Debtors, how it may accrue what Defendant calls Cooperative Advertising Funds. The process requires buyers to submit an "advertising claim" to Defendant and, upon review of such claims and support documentation, Defendant will issue credits to buyers based on those advertising claims. Various conditions are placed upon the buyers for receiving such credits.

Further, the language is clear that the advertising *claims* themselves cannot be deducted from the invoices directly, only the subsequently awarded *credits* may be. It is not, as Debtors argue, that the credits cannot be used to reduce an obligation under an invoice. In addition, these advertising claims may only be redeemed for cash if five specific conditions are met, and in particular that the buyer is no longer an authorized buyer of Defendant's products and the buyer is not indebted to Defendant. Debtors make no argument at any time that any of those conditions existed such that they could have redeemed their credits for cash. Therefore, such exception is inapplicable to Debtors. As it stands, Debtors were issued credits that were not redeemable for cash at the time of their application to Debtors' invoices.

Similarly, Debtors misrepresent the impact or import of the language in Article VII of the distributor agreement that provides that "[b]uyer shall have no right to take any deductions from or make any offsets against any MELA invoice, even for credits or other amounts owing to Buyer from MELA, without MELA's prior written approval." This language is entirely consistent with the prior language in section 2 of Exhibit G. It is not that credits cannot be applied; it is just that permission must be granted first. No one has alleged that Debtors' earned credits were not properly approved and applied.

The Court now turns to the merits of the section 547(b) and 553(b)(1) claims.

## B. Section 547(b)

Section 547(b) allows a trustee or debtor in possession to avoid a "transfer of an interest of the debtor in property";

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

  (A) on or within 90 days before the date of the filing of the petition;

  \*     \*     \*     \*     \*     \*

  and

(5) that enables such creditor to receive more than such creditor would receive if—

  (A) the case were a case under chapter 7 of this title;

  (B) the transfer had not been made; and

  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Defendant argues that the credits at issue do not qualify under section 547(b) as a preferential transfer because the credits fail to satisfy a number of the above elements. First, section 547(b) requires the "transfer of an interest of the debtor in property." According to Defendant, a credit is neither "property" nor "an interest in property": It is merely a right to reduce Debtor's obligation on the unpaid invoice. Second, for there to be a transfer, the transferee must exercise dominion over the credit or have the right to put the credit to its own purpose. Third, the transfer of these credits must be for the benefit of Defendant as the creditor. Here, Defendant argues that the application of the credits benefitted Debtors, not Defendant, by reducing Debtors' debts to Defendant and thereby increasing the pool of funds available for other creditors. Fourth, application of the credits did not mean Defendant received more than it would have received in a Chapter 7 liquidation. In fact, it received less because the application of the credit reduced the amount Debtors had to pay on their invoices.

■ While the Court agrees with Debtors' citation to 11 U.S.C. section 541 and the general principle that property of the estate is to be defined expansively, that alone does not dictate finding that the credits here constitute property of the estate. Section 541 defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." While this defines what interests of the debtor become part of the bankruptcy estate, it does not address "the threshold questions of the existence and scope of the debtor's interest in a given asset." *State of California v. Farmers Markets, Inc. (In re Farmers Markets, Inc.)*, 792 F.2d 1400, 1402 (9th Cir.1986). To answer those questions,

bankruptcy courts look to state property law to determine whether the credits here are an asset in which Debtors have an interest so that they may be included within the estate. *See Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). This precise issue has apparently never arisen in Arizona.

In support of an expansive definition of property, Debtors cite to several Arizona cases defining property as "any vested right of any value." *Rio Rico Properties v. Santa Cruz County,* 172 Ariz. 80, 88, 834 P.2d 166, 174 (Tax 1992) (citing *Allen v. Graham,* 8 Ariz.App. 336, 446 P.2d 240 (1968)). These cases, however, all arose in the due process context and involved the question of whether the legislature could enact a law that deprives a person of property without due process of law. The courts expressly stated that "the term 'property' as used in the due process clause refers to vested rights." *Allen v. Graham,* 8 Ariz.App. 336, 446 P.2d 240 (1968). Whether this definition of property extends beyond cases involving questions of due process and the constitutional principle of takings is unclear.

■ Assuming that this definition applies in the context here, a property right "vests" when every event has occurred that needs to occur to make the implementation of the right a certainty. *Hall v. A.N.R. Freight Sys., Inc.,* 149 Ariz. 130, 138, 717 P.2d 434, 442 (1986). A vested property right is a right that is "actually assertable as a legal cause of action or defense or is so substantially relied upon that retroactive divestiture would be manifestly unjust." *San Carlos Apache Tribe v. Superior Court,* 193 Ariz. 195, 200, 972 P.2d 179, 184 (1999).

■ A final determination of this issue is not necessary to reach a decision in this case. Because "property" is such a broad concept in bankruptcy, and potentially

would reach the credits at issue here, it is important to focus on the other elements of section 547(b) to determine whether a preference has occurred. Section 547(b) wisely does not compel the avoidance of *any* transfer of property, rather, it reaches only those that have a true preferential effect and, to determine that, it is necessary to examine the subsections of section 547(b).[2]

▮ The primary purpose of section 547(b) is two fold: to prevent the diminution of estate assets such that unsecured creditors are left with fewer assets from which to be paid their pro rata share and to prevent the preferential treatment of one creditor at a time when debtor is insolvent. These purposes of the preference law were succinctly stated by the Ninth Circuit in *In re Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir.1994):

> [A] transfer may be avoided under *section 547(b)* if it involves property of the debtor and the transfer reduces the amount of the bankruptcy estate available for the payment of other creditors. *Kupetz v. United States (In re California Trade Tech. Schs., Inc.)*, 923 F.2d 641, 645 (9th Cir.1991).

The use of the credits in this case resulted in no such reduction of amount available to pay others. The pay down of Debtors' invoices by the use of the credits in fact preserved for the estate and its creditors more assets from which the creditors could be paid. If Debtors had simply paid the full amount of the invoices, they would have paid over $1 million to Defendant. As it was, Debtors have only paid out of the estate approximately $828,000, thereby leaving in the estate an additional $262,000 in which the creditors may share.

In addition, the use of the credits did not in any way favor Defendant over any other creditor. The credits were not redeemable for cash and Debtors could not use the credits to pay down any other debt owing to another creditor.

The Court also agrees with Defendant that the "transfer" of the credits was not for the benefit of Defendant, as the creditor, as required by section 547(b). The actual benefit was, as Defendant states, for Debtors in that they did not have to pay the entire invoice with their own cash. For all practical purposes, they got a discount on their invoice. Defendant did not receive anything of value, in fact it really was required to give up something of value—approximately $262,000.

Debtors' argument that Defendant benefitted by the use of the credits is unconvincing. According to Debtors, because they paid down their outstanding balance using the credits, as opposed to purchasing new equipment with the credits, Defendant retained equipment that could be sold to other customers in exchange for cash, as opposed to merely credits. This argument is circular. How is it a benefit not to be paid cash for product so that, *perhaps*, you can sell other product to someone else for cash?

For all of these reasons, the Court concludes that Debtors cannot sufficiently plead a section 547(b) claim with respect to the credits.

## C. Section 553(b)(1)

▮ Similarly, the Court finds that Debtors cannot satisfy the requirements of setoff pursuant to section 553(b)(1). A setoff only applies where a *"creditor* off-

---

2. Debtors make a rather conclusory statement that every event has occurred here in order to give them a vested property right in the credits because the credits were in fact issued.

The Court is not so easily convinced, but because of its findings on the remaining elements of section 547(b) need not resolve this issue.

sets a mutual debt owing to the debtor against a claim against the debtor." (Emphasis added). Here, Debtors applied the credits to effectuate a setoff, and not the Defendant. While Defendant initially approved the receipt and calculation of the credits, the use of the credits was solely within Debtors' discretion to reduce their invoice. Debtors could have, arguably, paid the invoices in full in cash. There is no allegation that Defendant could have forced Debtors to apply the credits instead. Debtors in fact state that they chose to apply the credits towards the outstanding invoices. Defendant's actual acceptance of the credits and procedural application to reduce the invoice does not translate into a finding that Defendant actually exercised a legal right to offset a mutual debt within the meaning of section 563(b).

Further, there was no mutual debt owing between the parties. Defendant never owed Debtors any debt. Moreover, the use of the credits by Debtors did not improve Defendant's position vis a vis the other creditors, one of the primary purposes of invoking section 553(b)(1). In fact, it did the opposite and worked, in essence, to Defendant's detriment. Defendants received less than the total value of the invoice because the credits were exercised.

## IV. Conclusion

For the foregoing reasons, the Court grants Defendant's partial motion for summary judgment with respect to the claims by Debtors' that their use of credits to reduce their outstanding debts to Defendant constitute preferential transfers and setoffs under 11 U.S.C. sections 547(b) and 553(b)(1) respectively. Defendant is to prepare and lodge a form of order consis-

tent with this decision for the Court's signature.

So ordered.